382 F.2d 375
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 1291, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and Local 1242, International Longshoremen's Association, AFL-CIO, Respondents.
 No. 16329.
 United States Court of Appeals Third Circuit.
 Argued June 6, 1967.
 Decided August 8, 1967.
 
 Clarice W. Feldman, N.L.R.B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., N.L.R.B., on the brief), for petitioner.
 
 
 1
 Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa. (Abraham E. Freedman, Philadelphia, Pa., on the brief), for appellee Local Union 1291.
 
 
 2
 Richard H. Markowitz, Wilderman, Markowitz, & Kirschner, Philadelphia, Pa., for appellee Local 1242.
 
 
 3
 Before STALEY, Chief Judge, HASTIE, Circuit Judge, and SHERIDAN, District Judge.
 
 OPINION OF THE COURT
 
 4
 HASTIE, Circuit Judge.
 
 
 5
 In this case the National Labor Relations Board has found that two longshoremen's unions, Local 1291 and Local 1242, have threatened and coerced an employer, Northern Contracting Co., and that "an object" of the union's conduct was "forcing or requiring * * * [Northern] to cease doing business with * * * [another] person", Marine Transport, Inc., in violation of section 8 (b) (4) (ii) (B) of the National Labor Relations Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959. 29 U.S.C. § 158(b) (4) (ii) (B). The Board has asked us to enforce its order made pursuant to that finding. The decisive question is whether the record justifies the Board's finding that forcing Northern to cease doing business with Marine Transport was an object of the union coercion exerted against Northern.
 
 
 6
 Northern's business was the operation of a coaling pier. Marine Transport owned and operated the collier S.S. Marine Electric and contracted with Northern to have the ship docked and loaded at Northern's pier. Northern's services included loading the coal, for which purpose it employed stevedores who were members of a local not involved in this dispute. In the normal course of its business Northern had no occasion to employ members of either of the respondent locals.
 
 
 7
 The services customarily supplied by Local 1291 at the Port of Philadelphia included "hatch and beam" work, opening cargo hatches on the arrival of a ship and closing them before departure. However, Marine Transport elected to have the deck crew of S.S. Marine Electric accomplish the opening and closing of the ship's mechanized hatches, which were removed and replaced by the ship's hydraulic lifts and steam-powered winches.
 
 
 8
 Learning that no members of Local 1291 had been employed to open the hatches of the S.S. Marine Electric, delegates of that local approached Northern's general superintendent while the ship was loading. According to testimony credited by the Board, these delegates complained that no hatch and beam men had been employed to serve the ship and threatened to picket and cause a work stoppage at the pier unless Northern should hire a hatch and beam crew. Yielding to this threat, Northern accepted a hatch and beam crew supplied by Local 1291 and paid a full day's wage for the men thus hired, though they did no work whatever.
 
 
 9
 About an hour after the above-outlined threats by Local 1291, a representative of Local 1242 told Northern's vice president that he would have to hire a clerk for the S.S. Marine Electric loading or face picketing and a work stoppage. Although the vice president remonstrated that no clerk was needed, he yielded to the union and, through a ship's agent, hired a Local 1242 clerk for the operation. In this case also, the person thus hired rendered no service, but Northern paid the cost of his employment.
 
 
 10
 Upon this evidence the Board found that an object of the respondents' threats to picket Northern and compel a work stoppage at its pier was to cause Northern to stop doing business with Marine Transport.[1] In our view the record does not justify that finding.
 
 
 11
 Neither explicitly nor by implication did the union representatives call upon Northern to stop loading the ship or to discontinue business with Marine Transport. Rather, the unequivocal demands were that, because Marine had not arranged for the employment of a hatch and beam crew and a clerk and the work was proceeding without them, Northern should hire and pay for such supernumeraries. Indeed, from the unions' point of view, it was more advantageous thus to force Northern to hire a clerk and a hatch and beam crew than to lose that work, for the time being at least, by compelling Northern to stop doing business with Marine Transport. So, instead of putting pressure on Northern to stop dealing with Marine Transport until that shipowner should respect the unions' wishes,[2] the unions demanded simply and directly that Northern itself provide the desired employment.
 
 
 12
 We are not unmindful that this general controversy about the assignment of hatch and beam work did lead to a section 10(k) proceeding to determine whether the longshoremen were entitled to hatch and beam work on the ships of Marine Transport and another shipowner and, eventually, to an unfair labor practice proceeding against Local 1291 under section 8(b) (4) (D) of the Act for coercive action in defiance of the section 10(k) ruling. See NLRB v. Local 1291, International Longshoremen's Assn., 3d Cir., 1966, 368 F.2d 107. But this does not indicate that the union's coercive action here had an objective that is proscribed by section 8(b) (4) (ii) (B). Cf. NLRB v. Local 825, International Union of Operating Engineers, 3d Cir., 1964, 326 F.2d 218.
 
 
 13
 Enforcement of the order of the Board will be denied.
 
 
 
 Notes:
 
 
 [1]
 To constitute a violation of section 8(b) (4), the prohibited purpose need not be the sole object of the coercive action. NLRB v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284
 
 
 [2]
 The present record does not even indicate that any demand had been made by the unions upon Marine Transport before Northern itself was required to hire the unneeded employees. To the contrary, it appears that, in making his demand upon Northern's superintendent, the Local 1291 delegate stated that he had just learned that a ship was loading without the employment of a hatch and beam crew. This is significant because, absent an outstanding demand upon Marine Transport to be enforced by compelling Northern to stop doing business with Marine Transport, there would be little point in forcing such a cessation of business