**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL UNION NO. 164, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Respondent,**

Board of Education of the Township of Ridgewood, New Jersey, Intervenor.

No. 16492.

United States Court of Appeals Third Circuit.

Argued Sept. 14, 1967.

Decided Jan. 22, 1968.

Richard Adelman, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost,

Asst. General Counsel, Allison W. Brown, Jr., Attorneys, N. L. R. B., on the brief), for petitioner.

Thomas L. Parsonnet, Parsonnet, Parsonnet & Duggan, Newark, N. J., for respondent.

Vincent J. Apruzzese, Apruzzese & McDermott, Newark, N. J. (Orbe & Nugent, Octavius A. Orbe, Ridgewood, N. J., on the brief), for intervenor.

Before BIGGS, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Petitioner, N. L. R. B., seeks enforcement of its order finding respondent Union ("respondent") responsible for a secondary boycott of the type proscribed by § 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act as amended.

We first state the pertinent facts as found by the Trial Examiner and approved by the Board. The Board of Education of the Township of Ridgewood, New Jersey ("Ridgewood"), decided to construct a school at the so-called Travell site. Ridgewood engaged Breen Iron Works, Inc. ("Breen") as general contractor for the steel work. Breen fabricated the steel itself but subcontracted to East Rutherford Steel Erectors ("East Rutherford") the erection of the steelwork. Ridgewood also engaged K & Z Electric Company ("K & Z") as the general contractor for the electrical work.[1]

About April 14, 1965, K & Z began its electrical work on the site with union labor obtained under its existing collective bargaining agreement with respondent. About May 12, 1965, East Rutherford began erecting steel and brought a gasoline driven generator on the site to furnish electricity for welding purposes. About May 27, welding commenced. East Rutherford, pursuant to its collective bargaining agreements, employed a member of Local 825, International Operating Engineers AFL–CIO, to operate and maintain the welding machine.

When East Rutherford assigned its union employee to operate and maintain the machine, K & Z was advised by respondent Union that K & Z was obligated under its contract with respondent to employ an electrician to maintain the generator. The respondent relied upon the following provision in its agreement with K & Z:

"2.7—The contractor further agrees that he shall notify any general contractor, builder or owner with whom he may enter into any agreement calling for the work, labor or services of employees covered by this principal agreement as to the provisions set forth in same, and such agreement shall incorporate by reference the provisions of this contract, which shall be binding and operative and have the same force and effect upon such general contractor, builder or owner."[2]

\* \* \* \* \* \*

"13.15—All electrical welding apparatus shall be maintained by separate full time maintenance electricians as follows: \* \* \*."

Upon receipt of respondent's demand, K & Z notified the architects for Ridgewood. They in turn wrote to Breen advising Breen either to pay for the maintenance electrician which respondent demanded or use an acetylene welding method. Breen declined to do either. Instead it directed East Rutherford to stop work.

After a work stoppage of about eleven days, East Rutherford resumed work using the same generator. Thereupon respondent's business manager called an agent of K & Z and stated that the machine was back on the job and that K & Z under its contract with respondent was obligated to maintain it. The business

---

1. Under New Jersey law a school board is required to let five general contracts on all school construction work. One of the general contracts must be for the steel work and another must be for the electrical work.

2. It is agreed that K & Z did not comply with this provision.

manager was advised that K & Z had made no allowance for a maintenance electrician on the generator when it submitted its bid. He replied that it was K & Z's responsibility and that the only way it could get out of it was "by going to the owner and bring the facts." A letter from the respondent to K & Z stated that by failing to employ an electrician to maintain the machine, it was violating its collective bargaining agreement. The letter stated that appropriate action would be taken if nothing was done by June 10. It further stated that it would look only to K & Z to assure compliance with their agreement and would discuss the matter with no one else.

On June 11, when its demand had not been honored, the Union notified K & Z that its men were off the job. The unfair labor charges were filed June 14, 1965. They alleged that respondent engaged in a strike against K & Z with an object of forcing and requiring K & Z, Ridgewood and Breen to cease doing business with East Rutherford and with others at the Travell site. The strike lasted until July 1, but there was no picketing. However, the work on the project was delayed by the strike.

The Board determined that respondent was responsible for an illegal secondary boycott and this enforcement petition followed.

Section 8(b) (4) of the Act provides in relevant part that it shall be an unfair labor practice for labor organization or its agents:

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * * *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * : *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * *."

Clearly the Board was justified in finding that the respondent engaged in a strike. The real issue is whether an object thereof was unlawful.

As stated, the unfair labor charge was that an illegal object of the strike was to force or require K & Z, Ridgewood and Breen to cease doing business with East Rutherford and with each other. However, the Examiner's legal conclusion, adopted by the Board, was narrower:

"2. By inducing and encouraging employees of K & Z to engage in a strike, an object thereof being to force and require K & Z to cease doing business with East Rutherford, et al., the Respondent has engaged in and is engaging in unfair labor practices within the meaning of Section 8(b) (4) (i) (B) of the Act." [3]

In this enforcement action the respondent Union claims that its strike was directed solely to an area of legitimate concern to it, viz., a breach by K & Z of their collective bargaining agreement. On the other hand, the Board contends that the record adequately supports its finding of an illegal secondary boycott. We turn first to certain controlling principles distilled from Supreme Court cases in this area.

██ If protest activity by a Union against an employer is based solely on "proper" grounds, the secondary boycott provisions are inapplicable regardless of the severity of the impact on neutral employers. National Woodwork Manufacturers Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967);

---

3. The same acts were also found to be an unfair labor practice under 8(b) (4) (ii) (B).

Houston Insulation Contractors Ass'n v. N. L. R. B., 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967). However, if an object of such activity is one proscribed by the statute, the action will be condemned even though it might also have legitimate labor objectives. See National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

It is evident that in most of the situations to which the foregoing principles are applicable the findings of the Board may be of vital importance. This is generally true where the task is to determine the "object" behind particular overt action. Note that in each of the cited Supreme Court cases the Board's findings were upheld.

■ In the matter before us the Board found that an object of the respondent's strike was to force K & Z to cease doing business with East Rutherford. The so-called "raw" facts are not in dispute. Our problem is to determine whether, when tested by proper review standards, such facts warranted the ultimate factual inferences which the Examiner and the Board drew therefrom. We think the process of drawing such inferences must be tested by the rule that the Board's findings of fact "if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); and see Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). If the inferences drawn are reasonable on the entire record, we must enforce the Board's order even though we might conclude that contrary inferences would also have been justified. We examine the Board's findings against this legal background.

■ The respondent claims that it struck K & Z solely because of the following two breaches by K & Z of their collective bargaining agreement: 1) failure to incorporate the terms of the collective bargaining agreement in its contract with Ridgewood as required by § 2.7, 2) failure to comply with § 13.15 of their bargaining agreement to the effect that

respondent's members should maintain all electrical welding apparatus. The Board did not explicitly find that these were not objects of the strike. However, this is not a record deficiency because, assuming that the strike was motivated by the reasons given by respondent, the problem remained for the Board as to whether an object of the strike was one proscribed under the Act. We address ourselves to that issue.

The Examiner and the Board found that K & Z lacked the power to control the assignment of electricians to maintain the generator being used by East Rutherford. It inferred from this premise that a necessary object of the strike was to cause K & Z to exert pressure, by a chain reaction, back to East Rutherford. A resulting illegal object found by the Board was "to force and require K & Z to cease doing business with East Rutherford, et al." We consider that the term et al. was used by the Board to define the others who were sought to be affected by the strike, namely Ridgewood and Breen. However, it is equally clear from the Examiner's report, adopted by the Board, that East Rutherford was found to be the sole object of the strike as among Ridgewood, Breen and East Rutherford. This is made clear by the Examiner's opinion, adopted by the Board. He states that an object of the strike was "to force Breen to break or sever relations with East Rutherford." He went on to say that on the basis of the foregoing "East Rutherford was the actual and real target of respondent's conduct, and irregardless of the fact that the demand only called for a standby maintenance electrician."

We proceed then from the premise that the Board found that an object of the strike was to affect East Rutherford in a manner prohibited by the secondary boycott provisions of the Act. Our next inquiry is directed to the adequacy of the record to support that conclusion.

Respondent argues that the cited provisions of their collective bargaining agreement were decisive and that K & Z, by failing to comply with them, could not

use the resulting lack of control over the subject matter as a basis for converting their primary claim into a secondary boycott.

It is true that K & Z never had the power to insert in its contract with Ridgewood the provisions called for by its collective bargaining agreement with respondent. This was so because the record shows that the contract to be signed by the successful bidder was in effect part of the terms governing the bid. Thus, K & Z had no power in bidding this job to control any of the work on the school which was not covered by the contract tendered it by Ridgewood. The respondent says the legal inability of K & Z to get such a provision in its contract was irrelevant to its claim against K & Z based on their collective bargaining agreement. Certainly it was a relevant fact for the Board to consider in deciding whether respondent's strike also had an illegal object. We agree that it would not be decisive proof of such a charge, at least where the collective bargaining agreement contains provisions such as those here involved. Indeed, if the Board's decision can be said to stand for the legal proposition that the absence of the right to control is itself of decisive significance here, we cannot agree. But there is some suggestion that the Board also relied on other evidence. We therefore first consider the effect of the absence of the right to control and then the other evidence cited by the Board in order to decide whether, under proper standards of review, the Board's conclusion should stand.

The fact that New Jersey law prevented K & Z from obtaining the maintenance work suggests the possibility that a grievance against someone else may have been a motive for respondent's strike. Indeed, this was at least a premise for the Examiner's conclusion that respondent's real target was East Rutherford. But it must be remembered that the collective bargaining agreement was in existence before the contract between K & Z and Ridgewood was executed. There is no suggestion in the record that at the time the collective bargaining agreement was executed the provisions in question were directed at East Rutherford. Turning to the date of this dispute, it is difficult to see how the evidence concerning the breach of the collective bargaining agreement tended materially to show that East Rutherford was respondent's primary target. After all, East Rutherford had its contract with Breen and a collective bargaining agreement with its unionized employees covering such work. To say that an object of respondent's strike was to cause K & Z to put pressure on East Rutherford, by the chain reaction above described, is to suggest that it was seeking the maintenance work. Certainly this would suggest that respondent was inviting a possible jurisdictional dispute. The record here shows a careful attempt on respondent's part to avoid such a charge. Since it is not before us we express no opinion in that area. However, we think that the lack of control factor alone did not justify a reasonable inference in the setting that East Rutherford was a target or object of this strike in any secondary boycott sense.

As other supporting evidence the Examiner pointed to the fact that in a previous similar controversy the respondent had engaged in a strike which resulted in Ridgewood paying the respondent's members several thousands of dollars for a standby maintenance electrician. But this evidence does not tend to prove that an object of this strike was to put economic pressure on East Rutherford.

The Examiner also relied on evidence from which he inferred that K & Z as well as Ridgewood recognized the true nature of respondent's demand. Thus, K & Z contacted Ridgewood and sought to get Ridgewood to change the contract so that K & Z could comply with respondent's demand. Ridgewood, in turn, tried to get Breen to absorb the cost. Instead Breen instructed East Rutherford to stop work. But this does not justify an inference under the circumstances that respondent was trying to "get" anything from East Rutherford. Indeed, the respondent was happy to have its members paid by K & Z

for doing nothing. This is evident from the nature of its demand on K & Z. Compare N. L. R. B. v. Local 1291, Inter. Longshoremen's Ass'n, 382 F.2d 375 (3rd Cir. 1967).

Finally, the Examiner found that respondent itself recognized that an object of its strike was directed to others than K & Z. This finding was based on the fact that its business manager told K & Z that "the only way [K & Z] would get out of it is by going to the owner." While it is not entirely clear who was intended to be embraced by the term "owner," we think it clear that the reference is to Ridgewood. We say this because we cannot believe that respondent's representatives would be suggesting that K & Z approach the subcontractor (East Rutherford) of another general contractor on this matter. Moreover, K & Z in fact went to Ridgewood's architects. Thus, this evidence, in our view, has no substantiality when attempted to be used to help support the Board's conclusion that an object of the strike was to put pressure on East Rutherford as the "real" target.

We conclude that the record, whether viewed piecemeal or in its entirety, does not supply a substantial evidentiary basis for the Board's conclusion.

Enforcement of the Board's order will be denied.