429 U.S. 507 (1977)
NATIONAL LABOR RELATIONS BOARD
v.
ENTERPRISE ASSOCIATION OF STEAM, HOT WATER, HYDRAULIC SPRINKLER, PNEUMATIC TUBE, ICE MACHINE & GENERAL PIPEFITTERS OF NEW YORK AND VICINITY, LOCAL UNION NO. 638.
No. 75-777.
Supreme Court of United States.
Argued October 6, 1976.
Decided February 22, 1977.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
*509 Norton J. Come argued the cause for petitioner. With him on the brief were Solicitor General Bork, John S. Irving, and Jay E. Shanklin.
Laurence Gold argued the cause for respondent. With him on the brief were Patrick C. O'Donoghue, Donald J. Capuano, and George Kaufmann.[*]
MR. JUSTICE WHITE delivered the opinion of the Court.
Under § 8 (b) (4) (B) of the National Labor Relations Act, 29 U. S. C. § 158 (b) (4) (B),[1] a union commits an unfair *510 labor practice when it induces employees to refuse to handle particular goods or products or coerces any person engaged in commerce, where "an object" of the inducement or coercion is to require any person to cease doing business with any other person. A proviso, added to § 8 (b) (4) (B) in 1959, declares that the section "shall [not] be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." Although without the proviso the section on its face would seem to cover any coercion aimed at forcing a cessation of business, the National Labor Relations Board (Board) and the judiciary have construed the statute more narrowly, both before and after the proviso was added, to prohibit only secondary, rather than primary, strikes and picketing.[2]
Among other things, it is not necessarily a violation of § 8 (b) (4) (B) for a union to picket an employer for the purpose of preserving work traditionally performed by union members even though in order to comply with the union's demand the employer would have to cease doing business with another employer. National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612 (1967) (National Woodwork). The question now before us is whether a union seeking the kind of work traditionally performed by its members at a construction site violates § 8 (b) (4) (B) when it induces its members to engage in a work stoppage against an employer who does not have control over the assignment of the work *511 sought by the union. More specifically, the issue is whether a union-instigated refusal of a subcontractor's employees to handle or install factory-piped climate-control units, which were included in the general contractor's job specifications and delivered to the construction site, was primary activity beyond the reach of § 8 (b) (4) (B) or whether it was secondary activity prohibited by the statute. As we shall see, this issue turns on whether the boycott was "addressed to the labor relations of the contracting employer vis-à-vis his own employees," National Woodwork, supra, at 645, and is therefore primary conduct, or whether the boycott was "tactically calculated to satisfy union objectives elsewhere," 386 U. S., at 644, in which event the boycott would be prohibited secondary activity.

I
Austin Co., Inc. (Austin), was the general contractor and engineer on a construction project known as the Norwegian Home for the Aged.[3] As the result of competitive bidding, Austin awarded a subcontract to Hudik-Ross Co., Inc. (Hudik), to perform the heating, ventilation, and air-conditioning work for the Norwegian Home construction. Hudik employs a regular complement of about 10 to 20 steamfitters. For many years, these employees have been represented by respondent Enterprise Association (Enterprise), a plumbing and pipefitting union. Over the years Hudik and Enterprise have entered into successive collective-bargaining agreements, and such an agreement was in force at the time that the dispute involved in the present litigation arose. Austin had no agreement with Enterprise regarding the work to be done on the Norwegian Home project.
The subcontract between Austin and Hudik incorporated Austin's job specifications. These specifications provided that *512 Austin would purchase certain climate-control units manufactured by Slant/Fin Corp. (Slant/Fin) to be installed in the Norwegian Home. The specifications further provided that the internal piping in the climate-control units was to be cut, threaded, and installed at the Slant/Fin factory. At the time that Hudik entered into the subcontract with Austin, Hudik was aware that its employees would be called upon to install the Slant/Fin units but not to do the internal piping work for the units on the jobsite.
Traditionally, members of respondent union have performed the internal piping on heating and air-conditioning units on the jobsite. Also, Rule IX of the then-current collective-bargaining contract between Hudik and Enterprise provided that pipe threading and cutting were to be performed on the jobsite in accordance with Rule V, which in turn specified that the work would be performed by units of two employees.[4] There had been similar or identical provisions in previous collective-bargaining contracts. There is no dispute that the work designated by Austin's specifications to be performed at the Slant/Fin factory was the kind of cutting and threading work referred to in Rule IX.
When the Slant/Fin units arrived on the job, the union steamfitters refused to install them. The business agent of the union told Austin's superintendent that the steamfitters *513 "would not install the Slant/Fin units because the piping inside the units was steamfitters' work." Enterprise Assn. of Steam Pipefitters, 204 N. L. R. B. 760, 762 (1973). Hudik was informed that the factory-installed internal piping in the units was in violation of Rule IX of the union contract and "that such piping was Local 638's work." Ibid. When the union persisted in its refusal to install the units, thereby interfering with the completion of the Norwegian Home job, Austin filed a complaint with the Board, alleging that Enterprise had committed an unfair labor practice under § 8 (b) (4) (B) of the National Labor Relations Act by engaging in a strike and encouraging Hudik employees to refuse to install the Slant/Fin units in furtherance of an impermissible object. Specifically, Austin charged that the union's action was taken to force Hudik to cease doing business with Austin and to force Hudik and Austin to cease dealing with the products of Slant/Fin. The union's position before the Administrative Law Judge was that it was merely seeking to enforce its contract with Hudik and to preserve the jobsite cutting and threading work covered by Rule IX.
The Administrative Law Judge found that because Austin had specified factory-piped units, there was no internal threading and cutting work to be done on the jobsite of the kind covered by Rule IX and that no such work at the Norwegian Home project could be obtained through pressure on Hudik alone, even if Hudik was forced to abandon its contract, unless and until Austin changed its job specifications so as to provide the piping the union members had traditionally performed for Hudik as a subcontractor. The Administrative Law Judge thus concluded that the union had violated § 8 (b) (4) (B) because in seeking to enforce its contract and to obtain the work at the Norwegian Home jobsite, the union's object was in reality to influence Austin by exerting pressure on Hudik, an employer who had no power to award the work to the union.
*514 The Board agreed. Enterprise Assn., supra. It noted first that the steamfitters' refusal to install the Slant/Fin units "was based on a valid work preservation clause in the agreement with Hudik, the subcontractor, and was for the purpose of preserving work they had traditionally performed." 204 N. L. R. B. 760. This did not settle the legality of the work stoppage under § 8 (b) (4) (B), however; for "Hudik was incapable of assigning its employees this work; such work was never Hudik's to assign in the first place. . . . Respondent was exerting prohibited pressure on Hudik with an object of either forcing a change in Austin's manner of doing business or forcing Hudik to terminate its subcontract with Austin. Since the pressure exerted by the Respondent on Hudik was undertaken for its effect on other employers, this pressure was secondary and prohibited by Section 8 (b) (4) (B)." Ibid. (as amended by order of Aug. 30, 1973).
A divided Court of Appeals for the District of Columbia Circuit, sitting en banc, set aside the Board's order. 172 U. S. App. D. C. 225, 521 F. 2d 885 (1975). We granted certiorari because of an apparent conflict between the Circuits.[5] 424 U. S. 908 (1976).

II
In setting aside the Board's order, the Court of Appeals disagreed with the Board on both legal and factual grounds. We deal first with the Court of Appeals' proposition that "an employer who is struck by his own employees for the purpose of requiring him to do what he has lawfully contracted to do to benefit those employees can [n]ever be considered a neutral bystander in a dispute not his own." 172 U. S. App. D. C., at 243, 521 F. 2d, at 903 (footnote omitted). Under this view, a strike or refusal to handle undertaken to enforce such a contract would not itself warrant an inference that the union sought to satisfy secondary, rather than primary, *515 objectives, whatever the impact on the immediate employer or on other employers might be. Thus, where a union seeks to enforce a work-preservation agreement by a strike or work stoppage, the existence of the agreement would always provide an adequate defense to a § 8 (b) (4) unfair labor practice charge. This approach is untenable under the Act and our cases construing it.
Carpenters v. NLRB, 357 U. S. 93 (1958) (Sand Door), involved a collective-bargaining contract containing a provision, then quite legal, that " `workmen shall not be required to handle non-union material.' " Id., at 95. The case arose when certain nonunion doors arrived at a construction site and the union notified the contractor that the doors would not be hung. The Board found that the union had committed an unfair labor practice by encouraging employees to strike or refuse to handle the disputed doors in order to force the contractor to cease doing business with the door manufacturer. The union stood squarely on the contract; and as the case arrived here the sole question was whether the collective-bargaining provision was a "defense to a charge of an unfair labor practice under § 8 (b) (4) (A) when, in the absence of such a provision, the union conduct would unquestionably be a violation."[6]Id., at 101.
The union argued that if the statute was aimed at protecting neutral employers from becoming involuntarily involved in the labor disputes of others, "protection should not extend to an employer who has agreed to a hot cargo provision, for such an employer is not in fact involuntarily involved in the dispute," especially "when the employer takes no steps at the time of the boycott to repudiate the contract and to order his employees to handle the goods." In such circumstances, "[t]he union does no more than inform the employees of their contractual rights and urge them to take *516 the only action effective to enforce them." Id., at 105. These arguments were squarely rejected:
"Nevertheless, it seems most probable that the freedom of choice for the employer contemplated by § 8 (b) (4) (A) is a freedom of choice at the time the question whether to boycott or not arises in a concrete situation calling for the exercise of judgment on a particular matter of labor and business policy. Such a choice, free from the prohibited pressureswhether to refuse to deal with another or to maintain normal business relations on the ground that the labor dispute is no concern of his must as a matter of federal policy be available to the secondary employer notwithstanding any private agreement entered into between the parties. See National Licorice Co. v. Labor Board, 309 U. S. 350, 364. This is so because by the employer's intelligent exercise of such a choice under the impact of a concrete situation when judgment is most responsible, and not merely at the time a collective bargaining agreement is drawn up covering a multitude of subjects, often in a general and abstract manner, Congress may rightly be assumed to have hoped that the scope of industrial conflict and the economic effects of the primary dispute might be effectively limited." Id., at 105-106.
The Court went on to hold that inducements of employees that are prohibited by § 8 (b) (4) in the absence of a contractual provision countenancing them "are likewise prohibited when there is such a provision," 357 U. S., at 106. This was true even though the making and voluntary observance of such contracts were not contrary to law at the time that Sand Door was decided; however lawful, these contracts could not be enforced "by the means specifically prohibited" by the section. Id., at 108. The Court held that the legality of the union's conduct is to be viewed at the time of the boycott.
*517 Sand Door's holding that employer promises in a collective-bargaining contract provide no defense to a § 8 (b) (4) charge against a union has not been disturbed. In contemplating the 1959 amendments to the Landrum-Griffin Act, Congress viewed that part of Sand Door in which the Court suggested that contractual provisions having secondary objectives were not forbidden by law as creating a loophole in the Act. Section 8 (e) was enacted to close that loophole. See National Woodwork, 386 U. S., at 634. Section 8 (e), 29 U. S. C. § 158 (e) (1970 ed., Supp. V), makes it an unfair labor practice, with provisos, for unions and employers to enter into collective-bargaining contracts whereby the employer ceases or agrees to cease doing business with any other person. Although on its face not limited to agreements having secondary objectives, the section was construed by the Board and this Court as only closing the loophole left by Sand Door and as having no broader reach than § 8 (b) (4) itself. Section 8 (e) does not prohibit agreements made for "primary" purposes, including the purpose of preserving for the contracting employees themselves work traditionally done by them. 386 U. S.; at 635.
By no stretch of the imagination, however, can it be thought, that in enacting § 8 (e) Congress intended to disagree with or ease Sand Door's construction of § 8 (b) (4), under which a perfectly legal collective-bargaining contract may not be enforced by a strike or refusal to handle which in the absence of such a provision would be a violation of the statute. The intention of Congress as to this aspect of Sand Door could not be clearer. A proviso to § 8 (e) exempted from that section certain agreements in the construction industry that the section would otherwise have prohibited, but the Committee Report explained that the "proviso applies only to section 8 (e) and therefore leaves unaffected the law developed under section 8 (b) (4)," noting particularly that picketing to enforce agreements saved by the proviso "would *518 be illegal under the Sand Door case." H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39 (1959), 1 NLRB Legislative History of the Labor-Management and Disclosure Act of 1959, p. 943 (1959) (hereafter 1 Leg. Hist.). Undoubtedly, Congress embraced the rule then followed by the Board and approved by this Court in Sand Door that a contract permitting or justifying the challenged union conduct is no defense to a § 8 (b) (4) charge. To hold, as the Court of Appeals did, that a work stoppage is necessarily primary and not an unfair labor practice when it aims at enforcing a legal promise in a collective-bargaining contract is inconsistent with the statute as construed in Sand Door, a construction that was accepted and that has never been abandoned by Congress.
Nor did we modify Sand Door in National Woodwork. The union in National Woodwork induced the employees of four contractors not to handle precut and prefitted doors that had arrived at the respective construction sites. In three instances, the precut doors had been specified by the architect or the owner; in the fourth, the decision to use precut doors was that of the immediate contractor-employer, Frouge Corp. In each case, there was a provision in the collective-bargaining contract that carpenters would not be required to handle precut or prefitted doors.[7] The General Counsel of the Board filed charges in all four cases, asserting that the agreements were forbidden by § 8 (e) and that the refusal to handle in each case violated § 8 (b) (4) (B). The *519 trial examiner, whose findings were adopted by the Board, concluded that none of the agreements was invalid on its face but that in seeking to enforce the contract by refusing to handle in the three situations where the doors had been specified by the architect or owner, the union had violated § 8 (b) (4) (B). In these situations, the legality of the contract no more immunized the work stoppage from the § 8 (b) (4) charge than would "the then-lawful `hot-cargo' clause in the Sand Door case." Metropolitan Dist. Council of Phila., 149 N. L. R. B. 646, 658 (1964). On the other hand, in the Frouge situation, where the choice lay with the contractor who "therefore was in a position to . . . settle the dispute with the District Council by granting its request to assign that work to the carpenters on the jobsite," id., at 659 n. 21, the union was seeking only to regulate the relations between the general contractor and his own employees and to protect a legitimate economic interest of the employees by preserving their unit work. Neither the execution nor the enforcement of the Frouge agreement violated the Act. Only the Frouge decision was appealed. The Court of Appeals for the Seventh Circuit reversed in part, concluding that the Frouge agreement was prohibited by § 8 (e).
In reversing the Court of Appeals' § 8 (e) holding and agreeing that § 8 (b) (4) (B) had not been violated, we held that neither the Frouge contract nor its maintenance was illegal. Our rationale was not that the work-preservation provision was valid under § 8 (e) and that therefore it could be enforced by striking or picketing without violating § 8 (b) (4) (B). Expressly recognizing the continuing validity of the Sand Door decision that a valid contract does not immunize conduct otherwise violative of § 8 (b) (4), 386 U. S., at 634, we held that neither § 8 (b) (4) (B) nor § 8 (e) forbade primary activity by employees designed to preserve for themselves work traditionally done by them and that on this basis the union's conduct violated neither section. To determine whether the Frouge employees' refusal to handle was *520 permissible primary activity or was forbidden secondary coercion, we inquired:
"[Whether] under all the surrounding circumstances, the Union's objective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, Frouge, the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees." 386 U. S., at 644-645 (footnotes omitted).
We went on to rule that there was substantial evidence to sustain the finding of the Board that both the agreement and the union activity at the Frouge jobsite related solely to the preservation of the traditional tasks of the jobsite carpenters. In consequence, we agreed that there was neither a § 8 (b) (4) (B) nor a § 8 (e) unfair labor practice.
There is thus no doubt that the collective-bargaining provision that pipes be cut by hand on the job and that the work be conducted by units of two is not itself a sufficient answer to a § 8 (b) (4) (B) charge. The substantial question before us is whether, with or without the collective-bargaining contract, the union's conduct at the time it occurred was proscribed secondary activity within the meaning of the section. If it was, the collective-bargaining provision does not save it. If it was not, the reason is that § 8 (b) (4) (B) did not *521 reach it, not that it was immunized by the contract. Thus, regardless of whether an agreement is valid under § 8 (e), it may not be enforced by means that would violate § 8 (b) (4).[8]

III
The Court of Appeals was also of the view that the Board's "control" test, under which the union commits an unfair labor practice under § 8 (b) (4) (B) when it coerces an employer in order to obtain work that the employer has no power to assign, is invalid as a matter of law because it fails to comply with the National Woodwork standard that the union's conduct be judged in light of all the relevant circumstances. Again, we think the Court of Appeals was in error.
As we have seen, in National Woodwork the Board found unfair labor practices in three instances by inferring an improper secondary objective from the fact that the work sought *522 by the union was not under the control of the immediate employer, but it found no unfair practice in the Frouge situation because Frouge did have the power to settle the dispute with the union. In sustaining the Board with respect to Frouge and in posing the issue whether under all the circumstances the boycott was tactically calculated to satisfy union objectives elsewhere, we did not purport to announce a new legal standard and then ourselves to assess the facts in light of the modified construction of the statute. Such an assessment would have been a more proper task for the Board in the first instance;[9] yet there was no remand for further proceedings in the light of a newly fashioned standard. The Board had sustained the trial examiner, who had examined the facts to determine whether the agreement and boycott had secondary objectives and concluded that they did not. This Court simply sustained the Board's findings as supported by substantial evidence, without questioning either the legal standard employed by the Board or the Board's resolution of the facts under that standard. Furthermore, the Court expressly recognized that as the case came to it, no question was raised about the results with respect to the three contractors other than Frouge. 386 U. S., at 616-617, n. 3.
Here, the Administrative Law Judge, cognizant of National Woodwork and the Board's own precedents, examined the *523 history both of the relevant jobsite work traditionally done by the steamfitters and of the contractual provision calling for jobsite cutting and threading of pipe, assessed the agreement and refusal to handle in light of the actual conditions in the New York market, and concluded that " `under all the surrounding circumstances,' " Hudik was "only a means or instrumentality for exerting pressure against Slant/Fin and Austin with whom the Union has its primary dispute."[10] It thus does not appear to us that either the Administrative Law Judge or the Board, in agreeing with him, articulated a different standard from that which this Court recognized as the proper test in National Woodwork.[11]
*524 Nor is it the case that the Board, in applying its control standard, failed to consider all of the relevant circumstances. Surely the fact that the Board distinguishes between two otherwise identical cases because in the one the employer has control of the work and in the other he has no power over it does not indicate that the Board has ignored any material circumstance. The contrary might more rationally be inferred. Of course, the Board may assign to the presence or absence of control much more weight than would the Court of Appeals, but this far from demonstrates a departure from the totality-of-the-circumstances test recognized in National Woodwork.[12]
*525 There is little or no basis in the statute, its legislative history, or our cases for the Court of Appeals' conclusion that the distinction the Board has drawn between those cases where the struck employer is in position to deliver the work to the union and those where the work is controlled by others is erroneous as a matter of law. The Board has taken this approach in applying § 8 (b) (4) at least since 1958, when it decided Clifton Deangulo, 121 N. L. R. B. 676. In that case, the facts of which were similar to this one, Limbach, a plumbing and heating contractor, was engaged to install certain comfort induction units. The union claimed that certain provisions in its collective-bargaining agreement with Limbach reserved to its members much of the work that had been performed at the factory on these units. Therefore, at the union's behest, the employees refused to handle the units. Relying on its decision in the Sand Door case, Local 1976, United Brotherhood of Carpenters & Joiners, 113 N. L. R. B. 1210 (1955), and ruling against the union, the Board rejected the union's "main contentions . . . that the dispute was with Limbach, who was the primary employer; that the Union was seeking merely to exercise a valid contractual right to which Limbach had voluntarily agreed in advance, and that it was therefore engaged in privileged primary activity, not in proscribed secondary activity." 121 N. L. R. B., at 684. The Board also observed that Limbach "had given to union members all work within the Union's jurisdiction which it had been awarded on the project. It was powerless, of course, to give them additional work which it had not obtained and which, in fact, had been reserved by the very contractor through whom it had derived its own standing as an employer on the job." Id., at 685-686.
Since that time, as its decision in National Woodwork exemplifies, the Board has continued to interpret and apply *526 § 8 (b) (4) (B) to find an unfair labor practice, at least where the union employs a product boycott to claim work that the immediate employer is not in a position to award,[13] and it has declined to find a violation where the employer has such power, even if awarding the work might cause him to terminate contractual relations with another employer.[14] In the latter circumstances, the cease-doing-business consequences are merely incidental to primary activity, but not in the former where the union, if it is to obtain work, must intend to exert pressure on one or more other employers.
No legislative disagreement with the Board's interpretation of § 8 (b) (4) was expressed in 1959 when Congress amended the section. On the contrary, in adding the primary-secondary proviso to the section, as the relevant reports clearly show, Congress intended merely to reflect the existing law. "This provision does not eliminate, restrict, or modify the limitations on picketing at the site of a primary labor dispute that are in existing law." H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 38 (1959), 1 Leg. Hist. 942.
Furthermore, the Courts of Appeals regularly sustained the relevant Board interpretations of § 8 (b) (4), and we did not question the Board's approach in National Woodwork, let alone overrule it sub silentio. It is true that since our decision *527 in that case some Courts of Appeals, like the Court of Appeals for the District of Columbia Circuit, have concluded that the Board's interpretation of the statute is in error.[15] *528 The Board's reading and application of the statute involved in this case, however, are long established, have remained undisturbed by Congress, and fall well within that category of situations in which the courts should defer to the agency's understanding of the statute which it administers. See Bayside Enterprises v. NLRB, 429 U. S. 298, 303-304 (1977); NLRB v. Boeing Co., 412 U. S. 67, 75 (1973); NLRB v. United Insurance Co. of America, 390 U. S. 254, 260 (1968); Udall v. Tallman, 380 U. S. 1, 16 (1965); Sand Door, 357 U. S., at 107.

IV
Wholly apart from its determination that the union's conduct was justified as a measure to enforce its collective-bargaining contract and that the Board applied an incorrect standard for determining liability, the Court of Appeals held that since there was "no substantial evidence . . . in this record that the union's purpose was also `to satisfy union objectives elsewhere,' the Board's decision holding the union guilty of a Section 8 (b) (4) (B) violation may not stand." 172 U. S. App. D. C., at 244, 521 F. 2d, at 904. We disagree.
That there existed inducement and coercion within the meaning of § 8 (b) (4) is not disputed. The issue is whether "an object" of the inducement and the coercion was to cause the cease-doing-business consequences prohibited by § 8 (b) (4), the resolution of which in turn depends on whether the product boycott was "addressed to the labor relations of [Hudik] . . . vis-à-vis his own employees," National Woodwork, 386 U. S., at 645, or whether the union's conduct was "tactically calculated to satisfy [its] objectives elsewhere," id., at 644.[16]
*529 There is ample support in the record for the Board's resolution of this question. The union sought to enforce its contract with Hudik by a jobsite product boycott by which the *530 steamfitters asserted their rights to the cutting and threading work on the Norwegian Home project. It is uncontrovertible that the work at this site could not be secured by pressure on Hudik alone and that the union's work objectives could not be obtained without exerting pressure on Austin as well. That the union may also have been seeking to enforce its contract and to convince Hudik that it should bid on no more jobs where prepiped units were specified does not alter the fact that the union refused to install the Slant/Fin units and asserted that the piping work on the Norwegian Home job belonged to its members.[17] It was not error for *531 the Board to conclude that the union's objectives were not confined to the employment relationship with Hudik but included the object of influencing Austin in a manner prohibited by § 8 (b) (4) (B).[18]
The Court of Appeals was of the view that other inferences from the facts were possible. The court, for example, could "clearly see that it was possible for Hudik-Ross to settle the labor dispute which it had created. The record is void of any suggestion that Hudik-Ross attempted to negotiate a compromise with the union under which the union would have agreed to install the climate control units in exchange for extra pay or other special benefits." 172 U. S. App. D. C., at 239, 521 F. 2d, at 899. How this observation impugns the Board's finding with respect to the union's object is not clear. The union simply refused to handle the Slant/ Fin units and asserted that under the contract the cutting and threading work belonged to them. The commonsense inference from these facts is that the product boycott was in part aimed at securing the cutting and threading work at the Norwegian Home job, which could only be obtained by exerting pressure on Austin.
The statutory standard under which the Court of Appeals was obliged to review this case was not whether the Court of Appeals would have arrived at the same result as the Board did, but whether the Board's findings were "supported by substantial evidence on the record considered as a whole." 29 U. S. C. § 160 (e). See NLRB v. Babcock & Wilcox Co., 351 U. S. 105, 112 (1956); Packard Motor Car Co. v. NLRB, 330 U. S. 485, 491 (1947); Consolidated Edison Co. v. *532 NLRB, 305 U. S. 197, 229 (1938). It appears to us that in reweighing the facts and setting aside the Board's order, the Court of Appeals improperly substituted its own views of the facts for those of the Board.
The judgment of the Court of Appeals is
Reversed.
MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART (except for Part V) and MR. JUSTICE MARSHALL join, dissenting.
I dissent. Today's holding that union members exert secondary pressure in violation of § 8 (b) (4) (B) of the National Labor Relations Act by striking their own employer to protest his conceded violation of a lawful work-preservation provision in the parties' collective-bargaining agreement is patently precluded by National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612 (1967).

I
Briefly to summarize the facts detailed in the Court's opinion, the collective-bargaining agreement between respondent union and Hudik-Ross Co. (Hudik), a heating and air-conditioning contractor, included a provision that Hudik's employees represented by the union would cut and thread the internal piping in climate-control units installed by Hudik. This is concededly work traditionally performed by them. Hudik, however, on obtaining a subcontract from the Austin Co. to install climate-control units, agreed with Austin to install prefabricated units manufactured by Slant/Fin Corp., whose employees had cut and threaded the internal piping before the units were delivered to the jobsite. The union thereupon informed both Hudik and Austin that, because of Hudik's breach of the collective-bargaining agreement, its members would not install the units.
The National Labor Relations Board concluded that the union's refusal to install the units constituted "prohibited *533 pressure on Hudik with an object of either forcing a change in Austin's manner of doing business or forcing Hudik to terminate its subcontract with Austin," and was therefore secondary pressure prohibited by § 8 (b) (4) (B). Enterprise Assn. of Pipefitters, 204 N. L. R. B. 760 (1973) (as amended by order of Aug. 30, 1973). The Board conceded that the refusal " was based on a valid work preservation clause in the agreement with Hudik . . . and was for the purpose of preserving work [the union's members] had traditionally performed," ibid., but found nevertheless that the pressure was secondary because the union's primary dispute was necessarily with Austin, since Austin, and not Hudik, was in a position to control the assignment of the internal piping work, and therefore that Hudik, lacking such control, was a mere neutral in the dispute. The Court of Appeals for the District of Columbia Circuit, sitting en banc, rejected that analysis, 172 U. S. App. D. C. 225, 521 F. 2d 885 (1975), but the Court adopts it.

II
The Court's result cannot be squared with National Woodwork Mfrs. Assn. v. NLRB, supra, whose totality-of-the-circumstances test the Court purports to apply. Ante, at 524. That case and this are virtually indistinguishable in relevant respects. The contractor in National Woodwork ordered precut and prefitted doors in violation of a collective-bargaining provision that doors would be cut and fitted by its own employees at the jobsite. When the workers refused to hang the doors, charges were filed alleging that the initial agreement violated § 8 (e) of the NLRA as an agreement "whereby [the] employer . . . agrees to cease or refrain from handling . . . any of the products of any other employer," and that union pressure to enforce it violated § 8 (b) (4) (B), as pressure intended to force the employer "to cease using . . . the product of any other . . . manufacturer . . . ."[1]
*534 The Court had no difficulty in rejecting this overliteral interpretation of the Act. The legislative history of the relevant sections, read in the context of the evolution of national labor policy, demonstrated that the Taft-Hartley prohibition of secondary boycotts, as refined by the Landrum-Griffin Amendments, had adopted the traditional distinction between primary and secondary activity, prohibiting the latter and permitting the former:
"Congress, in enacting § 8 (b) (4) (A) of the Act, returned to the regime of Duplex Printing Press Co. [v. Deering, 254 U. S. 443 (1921),] and Bedford Cut Stone Co. [v. Journeymen Stone Cutters' Assn., 274 U. S. 37 (1927),] and barred as a secondary boycott union activity directed against a neutral employer, including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere." 386 U. S., at 632.
While "[t]his will not always be a simple test to apply," id., at 645, it is the test that Congress intended, and it has deep roots in the history of American labor policy.
National Woodwork exemplifies application of the test in precisely the factual context of the instant case: a dispute *535 over the application of a negotiated work-preservation rule to the use of prefabricated materials in the construction industry. The crux of National Woodwork is the following passage:
"The determination whether the `will not handle' sentence of Rule 17 and its enforcement violated § 8 (e) and § 8 (b) (4) (B) cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, Frouge, the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees." Id., at 644-645 (footnotes omitted).
Two principles follow from this passage. First, §§ 8 (b) (4) (B) and 8 (e) prohibit only conduct which is secondary, as that term has generally been understood in American labor law. If the purpose of a contract provision, or of economic pressure on an employer, is to secure benefits for that employer's own employees, it is primary; if the object is to affect the policies of some other employer toward his employees, the contract or its enforcement is secondary. Second, work preservation is necessarily a primary goal. Pressure undertaken in order to preserve work traditionally performed by unit *536 members aims at benefits for those members, and centers on a conflict between the employees and their employer, which, although it has secondary effects on other employers, as does the use of almost any economic weapon in a labor dispute, can only be regarded as primary. Thus, if a contract clause is intended to preserve work, its objective, and the objective of pressure to enforce it, is primary, and therefore legitimate. Only if examination of "all the surrounding circumstances" indicated that the purpose of the clause is not work preservation, but rather "to satisfy union objectives elsewhere," would the provision violate § 8 (e) and its enforcement by economic pressure violate § 8 (b) (4) (B).

III
The Court's acknowledgment that these principles must control the result here rings hollow in the face of its conclusion. For here, as in National Woodwork, the Board found that the union's actions were taken "for the purpose of preserving work [its members] had traditionally performed." 204 N. L. R. B., at 760. Cf. 386 U. S., at 645-646. It defies reality to deny that the union's principal dispute was with Hudik, the immediate employer of its members. It was Hudik which had acceded to the union's demand for the work-preservation clause particularly desired by its employees for their own protection. And it was Hudik which breached that clause. Nothing whatever in the record even remotely suggests that the union had any quarrel with Slant/Fin or Austin. Those companies were simply the vehicles used by Hudik to effect the breach which created the primary dispute between it and its own employees and their union. Nor is there the slightest basis for a suggestion that the true purpose of the work-preservation clause or the pressure applied to enforce it was to benefit employees "other than the boycotting employees or other employees of [Hudik]." Id., at 645. Rather, the Board found that the *537 purpose of the job action was "preserving work [the boycotting employees] had traditionally performed" for Hudik.[2] Since the purpose of the union's pressure was, by the Board's own finding, work preservation, and since National Woodwork holds that work preservation is a legitimate primary objective, the only possible conclusion on this record is that the pressure here was primary, and not prohibited by § 8 (b) (4) (B).
Nor is National Woodwork distinguishable, as contended, because Austin, and not Hudik, had the "right to control" the assignment of the work of cutting and threading the internal piping. Any conclusion from this that the union's pressure must have been directed at Austin and not Hudik is totally inconsistent with the premises and conclusion of National Woodwork.[3] First, Hudik was by no means a "neutral" *538 in the sense contemplated by Congress as warranting or requiring protection. See 386 U. S., at 624-628. Hudik made the agreement with its employees to satisfy their deep concern for work preservation. But in defiance of its obligations voluntarily assumed, Hudik accepted a subcontract knowing that it disabled it from keeping the bargain. It completely escapes me how Hudik can be said to be the neutral, and Austin the target, on those facts, particularly in face of the Board's finding that the work-preservation clause was primary and not prohibited by § 8 (e). Thus had the union been forced to strike Hudik to get the agreement, the strike would clearly also have been primary and not prohibited by § 8 (b) (4) (B). How, then, could Hudik become a neutral by violating the clause after agreeing to it? The Board did not find that the union's insistence upon compliance with the legitimate work-preservation agreement was a pretext to apply pressure against Austin in some unrelated dispute; on the contrary, the Board found that the purpose of the job action, as well as of the original agreement, was work preservation. It is simply impossible to conclude that anyone but Hudik was the target of that pressure.
Second, it is not true that Hudik was a neutral because it was powerless to deal with the union demands. As the Court of Appeals pointed out, if the union's purpose is truly work preservation for the benefit of its own members, it presumably would be willing to negotiate some substitute for full compliance, such as premium pay, to replace the lost work. *539 Nothing in this record indicates that Hudik made any attempt to reach that or any other compromise solution, and there is no reason to think that the union would not have been satisfied with such a result.[4] Moreover, in the long run, only Hudik could deal with the union demands, for it alone could decide to comply with the collective-bargaining agreement in the future. The union could certainly have reasoned that after Hudik knowingly breached its contracteven if at that time Hudik had no power to undo the breachunion pressure was necessary to deter Hudik from repeating its breach of the work-preservation agreement in the future.
Third, there is no basis in the record for the conclusion that Austin should be regarded as the "real" target of the union's pressure. The union had no quarrel with Austin, as far as the record shows, except for the artificial one erected by today's unpersuasive reasoning based upon the subcontract to Hudik. There is no indication, for example, that the union represented any employees of Austin, or even that it was engaged in any general effort to prevent Austin from specifying installation of prefabricated climate-control units in all its projects. Further, nothing in the record suggests that the union's reaction would have been different had someone other than Austin made the decision to use prefabricated units; whether Hudik accomplished the wrong to its employees by contracting with Austin, or simply by independently ordering prefabricated units, could make no *540 difference to the injured employees. Either way, their objective, as the Board found, was work preservation, and their grievance was with Hudik, and no one else.
The Court is wholly in error in treating the case as one of a factual finding by the Boardto be treated with deference by usthat Austin was the target of the union's pressure. The facts are not in dispute. The Board found that the reason for the union's refusal to install the prefabricated units was work preservation, but nevertheless concluded that this refusal was prohibited secondary pressure because Austin, not Hudik, had the "right to control" the disputed work, and because the union notified Austin, as well as Hudik, of its actions. "Right to control" may, in some circumstances, be relevant to the "inquiry into whether, under all the surrounding circumstances, the [u]nion's objective was preservation of work for [the pressured employer's] employees, or whether the [union pressure was] tactically calculated to satisfy union objectives elsewhere." National Woodwork, 386 U. S., at 644. But once the Board determined that the union's object was preservation of work its members had traditionally performed for Hudik, its factfinding task was completed. The Board concluded that despite this finding, Austin's "right to control" the disputed work required the conclusion that Austin was the union's target. This was an error of law, not a factual finding.[5]

*541 IV
The Court maintains that the collective-bargaining agreement between Enterprise and Hudik is irrelevant to the determination of whether the union exerted primary or secondary pressure, relying on Carpenters v. NLRB, 357 U. S. 93 (1958) (Sand Door). With all respect, this totally misapprehends the relevance of the agreement to the issue before us, and misapplies Sand Door.
In Sand Door, the union ordered its members not to handle doors ordered by their employer from a nonunion manufacturer. The manufacturer charged secondary pressure aimed at it, and the union defended on the ground that the strike was its response to the employer-contractor's breach of a provision in their collective-bargaining agreement that "workmen shall not be required to handle non-union material," and therefore primary pressure. The Court held that, although the collective-bargaining provision was not illegal,[6] pressure to enforce it was prohibited secondary pressure.[7]
Thus, Sand Door holds that pressure to enforce a secondary boycott clause remains secondary, despite the then legality of the clause itself; it is not authority that union pressure to enforce a concededly primary work-preservation clause (which, since the enactment of § 8 (e), is legal only because it is primary), is anything but primary pressure.[8] The union here *542 does not argue, as in Sand Door, that pressure otherwise secondary is magically transformed into primary pressure by an employer's prior agreement to support a secondary boycott. Rather, §§ 8 (b) (4) and 8 (e) are "to be taken pari passu," National Woodwork, supra, at 649 (Harlan, J., concurring), so that pressure to enforce an employer to honor a clause of a collective-bargaining agreement admittedly primary, because intended to preserve work traditionally performed by unit members, is also primary.[9] In short, the agreement in this case, as the Board found, was for a primary purpose; pressure brought to compel Hudik to agree to it would have been primary; and pressure brought to enforce it when Hudik breached it, whether by ordering prefabricated units himself, as in National Woodwork, or by entering a contract that required it to breach it, was no less primary.

*543 V[*]
Technological change has threatened the stability of jobs in a number of industries. Workers in those industries are understandably concerned about the possibility that new technological advances or increased reliance on prefabricated materials will render their skills superfluous, and eliminate their jobs, and have sought reassurance against those fears from their employers through collective bargaining. It might be argued that in the long run the national interest is better served by permitting technological change to proceed at its own pace, unhampered by the demands of labor, and that the problems of workers threatened with unemployment by such "progress" can be better dealt with by some other method than collective bargaining. But it is for Congress, not the Court, to decide how this problem is best solved. National Woodwork, 386 U. S., at 644; id., at 649-650 (Harlan, J., concurring). And the Court has consistently recognized that the national labor policy adopted by Congress is for "management and labor voluntarily to negotiate for solutions to these significant and difficult problems." Id., at 640. See also Fibreboard Corp. v. NLRB, 379 U. S. 203 (1964). Today's decision undermines this policy by permitting an employer which has voluntarily agreed to a work-preservation clause to subvert that agreement by "assigning to another party the rights [it] guaranteed to [its] own employees." Note, Secondary Boycotts and Work Preservation, 77 Yale L. J. 1401, 1417 (1968). This is surely a serious setback for national labor policy, and hardly conducive to labor peace.
MR. JUSTICE STEWART, dissenting.
I disagreed with the Court in National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612, 650. Until that decision *544 is overruled, however, it stands as an authoritative construction of § 8 (b) (4) (B) of the National Labor Relations Act. For the reasons stated in MR. JUSTICE BRENNAN'S dissenting opinion, I agree that the Court's decision today is "patently precluded" by the National Woodwork case. On that basis I join all but Part V of MR. JUSTICE BRENNAN'S dissenting opinion.
NOTES
[*] Briefs of amici curiae urging reversal were filed by Kenneth C. McGuiness, Robert E. Williams, and Douglas S. McDowell for the Air-Conditioning and Refrigeration Institute et al.; by Richard C. Hotvedt for the Associated General Contractors of America, Inc., et al.; and by Vincent J. Apruzzese and Francis A. Mastro for the Public Service Electric & Gas Co. et al.

Gerard C. Smetana, William H. DuRoss III, and Lawrence B. Kraus filed a brief for the Chamber of Commerce of the United States as amicus curiae.
[1] Section 8 (b) of the National Labor Relations Act, as set forth in 29 U. S. C. § 158 (b), provides in relevant part:

"It shall be an unfair labor practice for a labor organization or its agents
.....
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
.....
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."
[2] The pre- and post-1959 developments are fully canvassed in National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612 (1967).
[3] The facts here stated are taken from the findings made by the Administrative Law Judge and adopted by the Board. Enterprise Assn. of Steam Pipefitters, 204 N. L. R. B. 760 (1973).
[4] Rule IX provided in relevant part:

"Radiator branches, convector branches and coil connections shall be cut and threaded by hand on the job in accordance with Rule V." App. 89.
Rule V provided:
"MEN TO WORK IN UNITS OF TWO
"All work to be performed within the jurisdiction of Enterprise Association must be performed by journeymen steamfitters or apprentices working in units of two, one of whom must be a steamfitter. A unit shall be composed of:
"A. Steamfitter with a steamfitter, or
"B. Steamfitter with an apprentice." Id., at 87-88.
[5] For a discussion of the decisions of the Courts of Appeals on the issues presented in this case see n. 15, infra.
[6] Section 8 (b) (4) (A) was renumbered as § 8 (b) (4) (B) in 1959. As we shall see, no substantive changes made by the 1959 amendments had any effect on the rule established in Sand Door.
[7] Part of the same contractual rule provided that " `[n]o employee shall work on any job on which cabinet work, fixtures, millwork, sash, doors, trim or other detailed millwork is used unless the same is Union-made and bears the Union Label of the United Brotherhood of Carpenters and Joiners of America.' " National Woodwork, 386 U. S., at 615 n. 2. The Board found that this sentence violated § 8 (e). This finding, consistent with prevailing law, was not challenged by the union. See, e. g., NLRB v. Amalgamated Lithographers of America, 309 F. 2d 31, 35-36 (CA9 1962), cert. denied, 372 U. S. 943 (1963); Employing Lithographers of Greater Miami v. NLRB, 301 F. 2d 20, 29-30 (CA5 1962).
[8] The validity of the will-not-handle provision in this case was not challenged by the charging party, and the Board referred to it as a valid provision. Because the scope of the prohibitions in §§ 8 (b) (4) (B) and 8 (e) are essentially identical, except where the proscriptions in § 8 (e) are limited by the provisos in that section, the Court of Appeals regarded as anomalous that a valid provision in a collective-bargaining contract could not be enforced through economic pressure exerted by the union. This conclusion ignores the substance of our decision in Sand Door. Even though a work-preservation provision may be valid in its intendment and valid in its application in other contexts, efforts to apply the provision so as to influence someone other than the immediate employer are prohibited by § 8 (b) (4) (B). See George Koch Sons, Inc. v. NLRB, 490 F. 2d 323, 327 (CA4 1973).

Nor does the Board's decision undermine the collective-bargaining process as the Court of Appeals suggests. In appropriate circumstances, the Board has not found the lack of control to be determinative, Painters Dist. Council No. 20 (Uni-Coat), 185 N. L. R. B. 930 (1970), and the Board has declared its intention to continue to eschew a mechanical application of its control test in order to ascertain whether the struck employer is truly an unoffending employer. See Local 438, United Pipe Fitters (George Koch Sons, Inc.), 201 N. L. R. B. 59, 64 (1973).
[9] "[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U. S. 80, 95 (1943). This rule has not been disturbed. See FPC v. Texaco, Inc., 417 U. S. 380, 397 (1974); FTC v. Sperry & Hutchinson Co., 405 U. S. 233, 249 (1972); K. Davis, Administrative Law Treatise § 16.01, p. 397 (Supp. 1976). When an administrative agency has made an error of law, the duty of the Court is to "correct the error of law committed by that body, and after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." ICC v. Clyde S. S. Co., 181 U. S. 29, 32-33 (1901).
[10] 204 N. L. R. B., at 764. The Administrative Law Judge concluded that Austin and Slant/Fin were primary employers. The Board, while adopting the remainder of the Administrative Law Judge's report, did not reach this question.
[11] The Board addressed the question in George Koch Sons, Inc., supra. The Board recognized that there had been some ambiguity on this issue in earlier decisions.

"Specifically, of late, the Board has characterized its approach simply in terms of a right-of-control test. The test as stated would seem to imply that the Board looked solely at the pressured employer's `contract right to control' the work at issue at the time of the pressure to determine whether that pressure was primary or secondary. In fact, this is not now the Board's approach nor was it ever.
"Rather, the Board has always proceeded with an analysis of (1) whether under all the surrounding circumstances the union's objective was work preservation and then (2) whether the pressures exerted were directed at the right person, i. e., at the primary in the dispute. . . . In following this approach, however, our analysis has not [been] nor will it ever be a mechanical one, and, in addition to determining, under all the surrounding circumstances, whether the union's objective is truly work preservation, we have studied and shall continue to study not only the situation the pressured employer finds himself in but also how he came to be in that situation. And if we find that the employer is not truly an `unoffending employer' who merits the Act's protections, we shall find no violation in a union's pressures such as occurred here, even though a purely mechanical or surface look at the case might present an appearance of a parallel situation." 201 N. L. R. B., at 64 (footnotes omitted).
[12] The Board also adopted the Administrative Law Judge's discussion of the economic context in which the dispute arose.

The Administrative Law Judge was of the view that union pressure on Austin and other contractors who preferred factory-piped units could effectively foreclose Slant/Fin and similar producers from the market. The Board did not disturb the Administrative Law Judge's findings:
"If prepaid units cannot be installed in the large commercial, public, and industrial buildings in the New York area or in other areas effectively organized by the Union and other building trades unions, the manufacture will be materially affected and Austin and other engineers and general contractors will not specify their purchase and use in buildings." 204 N. L. R. B., at 764.
"In my opinion, it is an appropriate subject of official notice that in New York City and probably in all or most of the major cities in this country, the building and construction industry is unionized, certainly with respect to major industrial, commercial, and public construction. Unionized in this context means that craft unions affiliated with the AFL-CIO represent and have contracts for the employees who work on such projects and, in fact, the unions are the source of the labor supply and furnish the employees to the employer-contractors. The strategic position of the unions in the industry is confirmed by the fact that governmental efforts to increase the number of minority employees in the industry are concentrated on the unions and not on the employers. In most industries, if it is desired to increase the number of minority employees, governmental pressure is effectively directed to the employers. But in the construction industry it is the unions that control the labor supply and if the union steamfitter employees of Hudik on the Norwegian job refuse to work, other steamfitters will not be available to Hudik or to anyone else to perform work on the job." Id., at 764 n. 10.
[13] See, e. g., George Koch Sons, Inc., supra; International Assn. of Heat & Frost Insulators, Local 12, 193 N. L. R. B. 40 (1971); Enterprise Assn., Local 638, 183 N. L. R. B. 516 (1970); Local 742, Carpenters, 178 N. L. R. B. 351 (1969); Local 636, Plumbers & Pipefitters, 177 N. L. R. B. 189 (1969); Pipe Fitters Local No. 120, 168 N. L. R. B. 991 (1967); International Assn. of Heat & Frost Insulators, Local 53, 149 N. L. R. B. 1075 (1964); Ohio Valley Carpenters Dist. Council, 144 N. L. R. B. 91 (1963); International Longshoremen's Assn., 137 N. L. R. B. 1178 (1962); Local 5, United Assn. of Journeymen, 137 N. L. R. B. 828 (1962); Enterprise Assn., Local 638, 124 N. L. R. B. 521 (1959); Local 636, United Assn. of Journeymen, 123 N. L. R. B. 225 (1959).
[14] See, e. g., Pipefitters Local No. 120, supra, at 992; Metropolitan Dist. Council of Phila., 149 N. L. R. B. 646, 659 n. 21 (1964) (National Woodwork).
[15] Prior to this Court's decision in National Woodwork, the Courts of Appeals had uniformly held that it was a violation of § 8 (b) (4) (B) for a union to use economic pressures to obtain work that was not within the struck employer's power to award. See Ohio Valley Carpenters Dist. Council v. NLRB, 339 F. 2d 142 (CA6 1964); NLRB v. Int'l Longshoremen's Assn., 331 F. 2d 712 (CA3 1964); Local No. 5, United Assn. of Journeymen v. NLRB, 116 U. S. App. D. C. 100, 321 F. 2d 366, cert. denied, 375 U. S. 921 (1963); NLRB v. Enterprise Assn., 285 F. 2d 642 (CA2 1960); Local No. 636, United Assn. of Journeymen v. NLRB, 108 U. S. App. D. C. 24, 278 F. 2d 858 (1960). Generally, the Courts of Appeals did not treat the Board's control test as a per se rule, reasoning instead that the absence of the right to control the work sought is strong evidence that the objective of the economic pressure being applied by the union is to affect someone other than the struck employer.

In many of the pre-National Woodwork cases the unions argued that their activity was primary on the ground that they were merely enforcing valid work-preservation agreements. The Courts of Appeals uniformly rejected this argument for a variety of reasons. Two of the pre-National Woodwork cases flatly held that the existence of a valid work-preservation agreement cannot validate conduct that otherwise would be unlawful under § 8 (b) (4) (B). Ohio Valley Carpenters, supra, at 145; Local No. 5, supra, at 369-370.
Since this Court's decision in National Woodwork, six Circuits have addressed the control issue. The Fourth Circuit in a well-reasoned opinion has expressly sustained the Board's control test. George Koch Sons, Inc. v. NLRB, 490 F. 2d 323 (1973). The Ninth Circuit has done the same. See Associated General Contractors of California v. NLRB, 514 F. 2d 433 (1975). But see Western Monolithics Concrete Products v. NLRB, 446 F. 2d 522 (CA9 1971).
The Third, Eight, and District of Columbia Circuits have rejected the Board's control theory. In addition to the District of Columbia Circuit's opinion in the present case, see Local No. 636, United Assn. of Journeymen v. NLRB, 139 U. S. App. D. C. 165, 430 F. 2d 906 (1970); American Boiler Mfrs. Assn. v. NLRB, 404 F. 2d 556 (CA8 1968); NLRB v. Local 164, Int'l Brotherhood of Electrical Workers, 388 F. 2d 105 (CA3 1968). The First Circuit has said the same thing in dictum. Beacon Castle Square Bldg. Corp. v. NLRB, 406 F. 2d 188 (1969).
[16] The dissenters now assert a different definition of what constitutes prohibited secondary activity:

"If the purpose of a contract provision, or of economic pressure on an employer, is to secure benefits for that employer's own employees, it is primary; if the object is to affect the policies of some other employer toward his employees, the contract or its enforcement is secondary." Post, at 535.
National Woodwork did not, however, adopt this standard for applying the proscriptions of § 8 (b) (4) (B). The distinction between primary and secondary activity does not always turn on which group of employees the union seeks to benefit. There are circumstances under which the union's conduct is secondary when one of its purposes is to influence directly the conduct of an employer other than the struck employer. In these situations, a union's efforts to influence the conduct of the nonstruck employer are not rendered primary simply because it seeks to benefit the employees of the struck employer. National Woodwork itself embraced the view that the union's conduct would be secondary if its tactical object was to influence another employer:
"There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim." (Emphasis added.) 386 U. S., at 645.
Under the standard announced, we found no unfair labor practice in National Woodwork. Frouge, the struck employer, was faced with the choice of either giving the cutting and fitting work to its own employees or giving it to the door manufacturer. Cf. Fibreboard Corp. v. NLRB, 379 U. S. 203 (1964). The Court sustained the Board's finding that the union's sole object was to influence Frouge to give the work to its own employees. The union thus had no object of influencing the door manufacturer, even though any influence that the union had on Frouge would have had an incidental effect on persons with whom Frouge had commercial dealings. Cf. NLRB v. Operating Engineers, 400 U. S. 297, 304 (1971) ("Some disruption of business relationships is the necessary consequence of the purest form of primary activity").
The National Woodwork opinion also noted that the Court then had no occasion "to decide the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks." 386 U. S., at 630-631. That reservation was apparently meaningless, for under the theory of the dissent, seemingly derived from National Woodwork itself, striking workers may legally demand that their employer cease doing business with another company even if the union's object is to obtain new work so long as that work is for the benefit of the striking employees. If, for example, Hudik had in the past used prepiped units without opposition from the union, and the union had demanded that Hudik not fulfill its contract with Austin on the Norwegian Home joball for the benefit of Hudik employeesit would appear that the dissenters' approach would exonerate the union. Respondents take the same view. Tr. of Oral Arg. 22. We disagree, for the union's object would necessarily be to force Hudik to cease doing business with Austin, not to preserve, but to aggrandize, its own position and that of its members. Such activity is squarely within the statute.
Here, of course, the union sought to acquire work that it never had and that its employer had no power to give it, namely, the piping work on units specified by any contractor or developer who prefers and uses prepiped units. By seeking the work at the Norwegian Home, the union's tactical objects necessarily included influencing Austin; this conduct falls squarely within the statement of National Woodwork that a union's activity is secondary if its tactical object is to influence the boycotted employer.
[17] "It is not necessary to find that the sole object of the strike" was secondary so long as one of the union's objectives was to influence another employer by inducing the struck employer to cease doing business with that other employer. See NLRB v. Denver Bldg. Council, 341 U. S. 675, 689 (1951). See also Wilson v. Milk Drivers & Dairy Employees, Local 471, 491 F. 2d 200, 203 (CA8 1974); Riverton Coal Co. v. United Mine Workers, 453 F. 2d 1035, 1040 (CA6), cert. denied, 407 U. S. 915 (1972); NLRB v. Milk Drivers & Dairy Employees, Local 584, 341 F. 2d 29, 32 (CA2), cert. denied, 382 U. S. 816 (1965).
[18] The dissenters assert that "[n]othing whatever in the record even remotely suggests that the union had any quarrel with Slant/Fin or Austin." Post, at 536 and 539-540. The Court has held, however, that there is no need for the Board to make such a finding in order to conclude that a § 8 (b) (4) (B) violation has occurred. National Woodwork, 386 U. S., at 645, quoted at n. 16, supra.
[1] Section 8 (b) (4) (B) was added to the Act as § 8 (b) (4) (A) by the Taft-Hartley Act of 1947, and amended and renumbered by the Landrum-Griffin Act of 1959. For the history of these provisions, see National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612, 619-644 (1967). The present text of § 8 (b) (4) (B), in pertinent part, is set out in n. 1 of the Court's opinion, ante, at 509-510.

Section 8 (e) was added to the Act in 1959. It provides, in pertinent part:
"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . . ." 29 U. S. C. § 158 (e) (1970 ed., Supp. V).
[2] The Court argues, contrary to this finding, that the union's object was "to acquire work that it never had," because unit members had never done "the piping work on units specified by" a contractor who preferred prefabricated units. Ante, at 530 n. 16. The Board's finding that the union's aim was work preservation, rather than work acquisition, disposes of this argument. At any rate, striking workers in any work-preservation dispute have never before done the particular job at issue in the dispute, and are seeking to "acquire" work that has been assigned to other workers, but that is of a type that they have traditionally performed for their employer. As the majority correctly points out, ante, at 529 n. 16, the Court in National Woodwork had no occasion to decide what implications its analysis might have when a union seeks to acquire tasks not traditionally performed by its members, 386 U. S., at 630-631, and since this is not such a situation, I have no occasion to reach that question here.
[3] That National Woodwork required rejection of the "right to control" doctrine was quickly realized by the commentators.

"The modern primary-secondary analysis [of National Woodwork] requires the complete abandonment of the present `right to control' rule. The unit has bargained for its rights and signed a contract with its employer, who happens to be a subcontractor. These two are without doubt the primary parties. The general contractor is removed from this direct confrontation, enters into the picture after the agreement has been made, receives his authority over job placement of the complaining unit derivatively from the subcontractor, and is fully aware of the consequences of such work-preservation agreements. The effects upon the general contractor of any strike in this situation are thus ancillary to a primary dispute with the immediate employer vindicating bargaining unit concerns. This result is required if the right to strike is to be assured to the subcontractor's employees. . . . [T]he subcontractor is merely estopped from assigning to another party the rights he guaranteed to his own employees." Note, Secondary Boycotts and Work Preservation, 77 Yale L. J. 1401, 1416-1417 (1968). (Footnote omitted.)
[4] The Court purports to fail to see "[h]ow this observation impugns the Board's finding with respect to the union's object." Ante, at 531. That "finding" is based exclusively on the inference that because only Austin could satisfy the union's demands, Austin must have been the real target of the union pressure. But since there were means by which Hudik could have satisfied the union's protest, and it did not attempt to take advantage of them, the premise of the Board's argument falls. Cf. Local 742, United Brotherhood of Carpenters v. NLRB, 174 U. S. App. D. C. 456, 467, 468, 533 F. 2d 683, 694-695 (1976), cert. pending, No. 75-1706.
[5] It is true that a possible result of successful work-preservation pressure by the union might be "forcing a change in Austin's manner of doing business or forcing Hudik to terminate its subcontract with Austin." 204 N. L. R. B., at 760. But the same was true in National Woodwork. There, had the union succeeded in enforcing its work-preservation agreement, the contractor would likely have terminated its contract with the manufacturer of precut and prefitted doors. Such secondary effects are common in labor disputes, but do not compel the conclusion that they were the real object of the union, particularly where, as here, alternative outcomes might also have satisfied the union. See supra, at 538-539, and n. 4.
[6] Such "hot cargo" clauses, then legal, are now prohibited by § 8 (e). See n. 1, supra.
[7] Sand Door is entirely consistent with National Woodwork, for the object of the pressure on the employer-contractor in Sand Door was "to satisfy union objectives elsewhere," specifically, to change the labor policy of the manufacturer.
[8] As one commentator pointed out more than 10 years ago:

"Of course Sand Door holds that a valid contract is not a defense to a secondary boycott. But it would be a serious misreading of that case, and indeed of the entire statutory evolution, to apply that notion in the context of [work-preservation agreements]. Prior to 1959, a contract was lawful whether primary or secondary; Sand Door spoke only to the effect of the latter type of agreement on section 8 (b) (4). Section 8 (e) now generally prohibits the mere execution of such agreements. But if a contract is `primary'i. e., not within section 8 (e) at allit is equally primary to enforce it by economic pressure on the contracting employer." Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8 (b) (4) and 8 (e), 113 U. Pa. L. Rev. 1000, 1040 (1965). (Footnotes omitted.)
[9] Thus, while it is true that "a valid contract is not a defense to a secondary boycott," Lesnick, supra, n. 8, the Court of Appeals was correct that "an employer who is struck by his own employees for the purpose of requiring him to do what he has lawfully contracted to do to benefit those employees can [n]ever be considered a neutral bystander in a dispute not his own." 172 U. S. App. D. C., at 243, 521 F. 2d, at 903. (Emphasis added.) Of course, this statement presumes that enforcement of the work-preservation agreement is the true object of the union pressure, as the Board found was the case here, and not a mere pretext. If it were found, for example, that the union only enforced the agreement against prefabricated products manufactured by nonunion companies, and not against others, the object of the pressure would not be primary (enforcing the work-preservation agreement), but secondary (influencing the labor policy of the manufacturer). Cf. National Woodwork, 386 U. S., at 646.
[*] MR. JUSTICE STEWART does not concur in this Part.