Donald W. ATWELL, et al., Petitioners,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent.

Charles M. DALLA, et al., Petitioners,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent.

Ralph K. CALDWELL, et al., Petitioners,

v.

GENERAL SERVICES ADMINISTRATION and Merit Systems Protection Board, Respondents.

James D. ALLEN, Petitioner,

v.

VETERANS ADMINISTRATION and Merit Systems Protection Board, Respondents.

Berma F. CARTER and National Federation of Federal Employees, Petitioners,

v.

John F. LEHMAN, Jr., Secretary, Department of the Navy, Respondent.

Nos. 80–2026, 80–2116, 80–2317, 80–2345 and 80–2313.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1981.

Decided Dec. 18, 1981.

---

Charles A. Hobbie, Staff Counsel, American Federation of Government Employees, AFL–CIO, Washington, D. C., with whom James R. Rosa, Gen. Counsel, American Federation of Government Employees, AFL–CIO, Washington, D. C., was on the brief, for petitioners Atwell, et al., in Nos. 80–2026, 80–2116, 80–2317, and 80–2345.

Bruce P. Heppen, Staff Atty., National Federation of Federal Employees, Washington, D. C., with whom Catherine Waelder, Gen. Counsel, National Federation of Federal Employees, Washington, D. C., was on the brief, for petitioners Carter and National Federation of Federal Employees in No. 80–2313.

Michael J. Ryan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief, for respondents.

Jane M. Edmisten, Atty., Merit Systems Protection Board, Washington, D. C., entered an appearance for respondent Merit Systems Protection Board.

Before TAMM, WILKEY and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

These consolidated cases come before us on review of final orders of the Merit Systems Protection Board (MSPB or Board) and present an important issue of first impression arising under the 1978 restructuring of the federal personnel system. Petitioners are employees of various agencies of the federal government, and the employment status of each is governed by the provisions of the Civil Service Reform Act of 1978 (CSRA or Act). Although certain constitutional questions are posed as well, the critical issue we must resolve is one of statutory construction and involves the appeal rights of employees whose grade under the federal job classification scheme is reduced. The MSPB, the entity created under the 1978 Act to hear challenges to agency actions adversely affecting the job-related entitlements of employees, concluded that it lacked jurisdiction to entertain the appeals pursued by petitioners. As we believe that the Board correctly construed the appellate scheme imposed by the 1978 Act, and as we find no faults of constitutional dimension with that scheme, we affirm.

## I. THE FACTUAL BACKGROUND

There is no significant disagreement regarding the facts. Each of the individual petitioners [1] was employed in some capacity by a division of the United States Government during or following 1978. Each petitioner was at the relevant time an "employee" in the civil service of the federal government for the purposes of the position classification and grading scheme used to determine the appropriate level of compensation and related benefits.[2] Similarly, each petitioner was an "employee" as that term is defined in the provisions of the civil service laws that confer on federal workers the right to initiate appellate and grievance procedures. *See* 5 U.S.C. § 7511(a)(1) (Supp. III 1979).

The current dispute is the product of a federal reclassification of the various positions held by petitioners. Under the civil service laws, an agency is permitted to raise or lower the Government Service grade at which the positions under its administration are set. 5 U.S.C. § 5107 (Supp. III 1979). In performing this reclassification, federal agencies are directed to apply certain objective criteria in an attempt to provide uniform standards applicable across agency lines. *Id.*; 5 U.S.C. §§ 5110, 5112 (Supp. III 1979). Each of the positions held by petitioners in the instant litigation was reclassified downward pursuant to this process.[3]

As noted above, the position classification determinations of an agency are the touchstones by which compensation, responsibility, and related personnel decisions are made. Thus, where the grade of a civil servant's position is lowered, reductions in pay and fringe benefits would ordinarily be the norm, and loss of promotion prospects might also be expected. In recognition, however, of the fact that an employee whose position is reclassified may be harmed through no "fault" of his own, Congress, in structuring the civil service, mandated the provision of certain offsetting benefits where a position is lowered in grade. In most cases, the employee whose position is downgraded is entitled to retain for a two-year period the former grade of the position, and during this period the retained grade is used for the purpose of computing compensation and related fringe

1. The current litigation represents the consolidation of five separate petitions for review of orders of the Merit Systems Protection Board (MSPB). In No. 80–2026, petitioner Donald W. Atwell and twenty-five other employees of the Department of the Army challenge the MSPB's dismissal of their appeals, *Atwell v. Department of the Army*, MSPB Order No. PH075299098 (July 25, 1980). In No. 80–2116, petitioner Charles M. Dalla and six other employees of the Treasury Department challenge a similar decision and order of the MSPB, *Dalla v. Department of the Treasury*, MSPB Order No. DE075209004 (Aug. 18, 1980). In No. 80–2317, petitioners Ralph K. Caldwell and William L. Warfield, employees of the General Services Administration, challenge the MSPB order and decision in *Caldwell v. GSA*, MSPB Order No. PH075299066 (Sept. 26, 1980). No. 80–2345 is itself the consolidation of eleven separate MSPB proceedings involving twenty-two federal employees and six agencies, *Allen v. Veterans Administration*, MSPB Order No. SF075209030 (Oct. 2, 1980). In No. 80–2313, petitioner Berma F. Carter, an employee of the Department of the Navy, challenges the MSPB order and decision in *Francetich v. Department of the Air Force*, MSPB Order No. AT07520912 (Oct. 2, 1980), which disposed of her case along with other related ones. Ms. Carter was represented by the National Federation of Federal Employees, which was itself a petitioner in No. 80–2313. The other petitioners were represented by the American Federation of Government Employees, AFL–CIO, which was not a party of record.

2. The applicable definition of "employee" is found at § 5102(a)(2) of title 5 of the United States Code. 5 U.S.C. § 5102(a)(2) (1976). The current federal grading and classification scheme is contained in Chapter 51 of title 5, 5 U.S.C. §§ 5101–5115 (1976 & Supp. III 1979).

3. Although the details of the grading and classification scheme are not important in the current context, we would note that positions are first to be "classified" so as to group comparable positions together; then, different classes of positions that vary with respect to the kind or subject matter of the work are "graded" so that within each grade comparable levels of responsibility and difficulty obtain. *See* 5 U.S.C. §§ 5102(a)(4)–(5), 5102(2) (1976). Each of the petitioners occupied a *position* that was reclassified downward and continued to occupy that position after the reclassification; as a result of the reclassification, in turn, the grades of the positions were lowered.

perquisites. 5 U.S.C. § 5362 (Supp. III 1979). Furthermore, when the two-year period ends, the employee continues to receive the basic rate of pay that he received before the assignment to the "new" position. 5 U.S.C. § 5363 (Supp. III 1979). Although this scheme is somewhat complex, it suffices to say that the employee whose position is downgraded never has his pay lowered as a net result of the reclassification, and retains his former grade for two years; the affected employee does, however, lose the pay raises and similar benefits that are accorded those occupying positions graded at the level of his former position.[4]

Notwithstanding these offsetting emoluments, petitioners sought to challenge administratively their downgradings. Each petitioner sought review of the reduction in grade with the appropriate field office of the MSPB. In each case, the petition was dismissed for want of jurisdiction at the field office level, and in each case the full Board entered a final opinion and order sustaining the dismissals.

The Board applied substantively identical reasoning in denying the appeals. Relying either explicitly or by implication on its decision in *Atwell v. Department of the Army*, MSPB Order No. PH075299098 (July 25, 1980), Atwell Joint Appendix (A.J.A.) at 43–53, the Board concluded that it lacked jurisdiction under the 1978 reform provisions to hear appeals of reductions in grade where grade and pay retention were mandated. In its *Atwell* order the Board conceded that, under the legal regimen that obtained prior to the CSRA, a reduction in grade would have been appealable regardless of pay retention; it found, however, that the changes wrought by the 1978 Act altered the prior scheme and precluded any such appeals. *Id.* at 2, 5, 7–9; A.J.A. at 44, 47, 49–51.

The petitions for review consolidated in the current litigation ensued. Although the facts vary among the individual civil servants, the dispositive legal issues are identical. Petitioners challenge the Board's determination of the contours of its jurisdiction, arguing that that determination is inconsistent both with the plain meaning of the relevant statutory provision and with the intent of the Congress. In the alternative, petitioners argue that if the Board's construction of the CSRA is correct, then the jurisdictional provisions of the Act violate the due process component of the fifth amendment to the federal Constitution and the equal protection guarantees implied in that amendment. Respondents, the Board and several federal agencies, contend that the Board properly delimited its jurisdiction and that the appellate scheme set forth under the 1978 Act comports with the Constitution.

## II. THE STATUTORY BACKGROUND

The focal point of this litigation is the civil service scheme currently in force in the United States, a product in part of the CSRA. Our inquiry into the proper construction of the provisions that now govern will, however, be aided by a brief analysis of the pre-CSRA law.

### A. The Pre–CSRA Civil Service Law

The civil service positions of the United States Government have, since near the end of the 1940's, been classified in a schedule of grades according to the responsibilities and demands of the functions performed. The basic themes of the classification scheme have remained constant to this day: civil servants performing substantially equal work should receive equal pay, and variations in compensation should reflect the differences in responsibilities, qualifications, and demands of the covered positions. *See* 5 U.S.C. § 5101 (1976). Under the pre-CSRA regime, the Civil Service Commission was empowered to set objective standards applicable across agency lines to ensure attainment of the congressional aims noted above. *See* 5 U.S.C. § 5107 (1976) (amended 1978).

---

**4.** The currently applicable scheme of grade and pay retention is discussed at pp. 278–279, *infra.*

An unfortunate but necessary concomitant of a classification scheme is the need to reclassify positions where necessary to correct earlier error or to respond to alterations in circumstances. Upward reclassifications seldom cause alarm or irritation to those "subjected" to them; downward ones, however, can pose significant immediate financial losses and long-term career damage.[5] *See* Report of the Committee on Post Office and Civil Service on the Civil Service Reform Act of 1978, H.R.Rep.No. 1403, 95th Cong., 2d Sess. 13 (1978), U.S.Code Cong. & Admin.News p. 2723. [*hereinafter* House Report No. 1403].

The pre-CSRA civil service scheme responded to the inequities posed by downgrading in two ways. First, Congress sought to lessen the financial sacrifice imposed by a reduction in grade through salary retention. Under the provision in effect immediately prior to the passage of the CSRA, an employee subjected to a reduction in grade was entitled to receive for two years the basic rate of pay received before the reassignment. 5 U.S.C. § 5337 (1976) (repealed). Although the higher rate of pay was used during the two-year period for the computation of cost-of-living increases, 5 U.S.C. § 5337 (1976) (repealed), the lower rate of pay of the new grade was relied upon for all other purposes. When the two-year adjustment period ended, the reassigned employee began receiving the lower pay rate and was treated in all respects as an employee classified at the reduced grade. See 5 U.S.C. § 5337(a) (1976) (repealed).

Second, the Civil Service Commission interpreted the relevant statutes as guaranteeing to employees whose positions were downgraded a right to challenge administratively the agency reassignment decision. Under the applicable Commission regulations, a reduction in grade [6] was deemed an "adverse action" and therefore gave the affected employee the benefit of the full panoply of administrative appellate procedures. *See* 5 C.F.R. § 752.201(b)(4) (1978). These appellate procedures were available, it should be noted, *regardless* of the existence of salary retention. Accordingly, the employee whose position was reclassified downward received the benefit of full "adverse action procedures," including the right to respond to the agency's proposed action and the right to a written decision.[7] The employee could also appeal an unfavorable decision to the Federal Employee Appeals Authority and to the Appeals Review Board, the appellate adjudicatory bodies of the Civil Service Commission. 5 C.F.R. § 752.203 (1978); 5 C.F.R. §§ 772.101–.404 (1978).

For the purposes of the present litigation, the critical point to note regarding the pre-CSRA civil service laws is that the employee whose grade was lowered had the right to challenge the agency action in *two* distinct ways: first, the employee was entitled to file a *classification appeal* with the Civil Service Commission itself, in which the only cognizable issue was whether the Commis-

5. As the House of Representatives Report accompanying the House version of the CSRA put the matter:

Over the past several years the downgrading of Federal employees for reasons beyond their control has become one of the most pressing problems facing the Government's civilian work force.... Employees who are downgraded not only experience a reduction in pay but in many cases suffer irreversible damage to their careers. For an employee who is approaching retirement, a reduction in grade can be particularly damaging.

Report of the Committee on Post Office and Civil Service on the Civil Service Reform Act of 1978, H.R.Rep.No. 1403, 95th Cong., 2d Sess. 13 (1978) [*hereinafter* House Report No. 1403].

6. The civil service laws that preceded the Civil Service Reform Act of 1978 (CSRA) did not specifically deem a reduction in grade an appealable agency action; rather, 5 U.S.C. § 7511 (1976) (repealed) employed the more amorphous phrase "reduction in rank or pay" and made such reductions appealable. *See* 5 U.S.C. §§ 7511–12 (1976) (repealed).

7. For a discussion of the adverse action procedures that obtained before passage of the CSRA, *see* Note, 26 Wayne L.Rev. 97, 103–05 (1979). These procedures were, as this commentator and others have noted, exceedingly time-consuming and cumbersome, and the new Act has simplified them somewhat. *See id.* at 113–14.

sion's classification standards had been properly applied to the position or positions at issue. 5 U.S.C. § 5112(b) (1976) (amended 1978); Federal Personnel Manual Chapter 511, Subchapter 6. Second, and more important in the present context, the employee was free to challenge the decision to assign *him* to the lower-graded position rather than, for example, to another position at the same grade as that of his former job. In other words, the employee, in addition to the classification appeal, also had the right to challenge the propriety of *his* downgrade; he could demand that the concerned agency show why it did not take available measures to spare him the agony and financial loss of a downgrade. *See* 5 C.F.R. § 752.201(b)(4) (1978); Federal Personnel Manual Chapter 752, Appendix A.

## B. *The Post-CSRA Law*

The Civil Service Reform Act of 1978 significantly altered the civil service structure of the United States. The Civil Service Commission was abolished, and two successor agencies were established to carry out the functions the Commission had formerly performed. The Office of Personnel Management (OPM) was created to administer the federal personnel system; it assumed the statutory responsibility for monitoring the classification system, which was largely unchanged by the CSRA. *See* Section 101 of Reorganization Plan No. 2, *reprinted in* 5 U.S.C. § 1101 note (Supp. III 1979); 5 U.S.C. § 1101 (Supp. III 1979); 5 U.S.C. Chapter 51 (Supp. III 1979). The Merit Systems Protection Board was established to assume the appellate adjudicatory responsibilities formerly performed by the Civil Service Commission's appellate arms. *See* Section 201 of Reorganization Plan No. 2 of 1978, *reprinted in* 5 U.S.C. § 1101 note (Supp. III 1979); 5 U.S.C. §§ 1201–09 (Supp. III 1979).

As was the Commission before it, the OPM is charged with the duty of formulating classification standards applicable throughout the federal system. 5 U.S.C. § 5105 (Supp. III 1979). Individual federal agencies in turn gauge their employment positions against the OPM standards and assign those positions to the appropriate grade. 5 U.S.C. § 5107 (Supp. III 1979). Each agency, as necessary, is empowered to make decisions to reclassify positions upward or downward, adhering always to the OPM guidelines. *Id.* That reclassification is a valid agency action if done in the proper fashion is beyond cavil. *See, e.g., Albert v. United States*, 437 F.2d 976, 978–79, 194 Ct.Cl. 95 (1971).

The CSRA continued the policy of compensating at least partially those whose positions were downgraded in a reclassification; indeed, the CSRA extended the compensatory benefits. Under the new Act, the affected employee continues to hold for a two-year period the *grade* of his former position. 5 U.S.C. § 5362(b) (Supp. III 1979).[8] During this period of grade retention, the higher grade is used to determine salary and other matters of remuneration and to establish retirement, life insurance, and promotion entitlements. 5 U.S.C. § 5362(c) (Supp. III 1979). Further, the CSRA extended the immediate financial protection provided the downgraded employee; the new scheme of pay retention provides that, when the two-year period of grade retention terminates, the employee continues to receive, at a minimum, the basic pay of the pre-reclassification position. 5 U.S.C. §§ 5363(a)–(b) (Supp. III 1979).[9] Moreover, if comparability increases applicable to the new position are granted by Congress, the employee receives fifty

---

**8.** The benefit of grade retention under 5 U.S.C. § 5362(b) (Supp. III 1979) is available if the position at issue was classified at the higher grade for a continuous period of at least one year immediately before the reduction. 5 U.S.C. § 5362(b)(2) (Supp. III 1979).

**9.** The retained pay of the employee cannot, however, exceed an amount equal to 150% of

the maximum rate of pay of the "new" position. In other words, under retained pay a downgraded employee's "special" pay cannot exceed by half what other workers occupying the same position receive as the maximum amount of "basic" pay. *See* 5 U.S.C. § 5363(b) (Supp. III 1979).

percent of the increase given those receiving the maximum pay for the new position. 5 U.S.C. § 5363(a) (Supp. III 1979). Although this new pay retention scheme is difficult to explain succinctly, the core notion is that the affected employee's pay is never lowered in absolute terms as a result of the reduction; rather, absent unusual circumstances, the employee loses the benefits of pay retention and is paid at the rate of the lower grade only when the new amount of compensation exceeds the retained pay rate.

By any measure, the grade and pay entitlements provided under the CSRA exceed the compensating benefits accorded under the pre-CSRA plan. Petitioners contend that these expanded benefits evince one of the essential themes of the CSRA, that of increasing the protections accorded federal employees who are affected adversely by personnel actions. Difficulties arise, however, when our focus shifts to the new scheme of administrative appeals created under the CSRA.

The post-CSRA civil service system retains much of the pre-1978 administrative appellate structure. In the context of employees whose positions are downgraded *without* grade and pay retention, there is no doubt that a right to file a classification appeal continues to exist. *See* 5 U.S.C. § 5366(a)(2)(A) (Supp. III 1979). The critical question in this case is whether the CSRA eliminated, perhaps as a *quid pro quo* for the expanded pay and grade retention benefits, the right of downgraded employees to appeal the *individual* downgrading decision. As noted above, the crux of the distinction between the two sorts of appeals is that in the classification type, only general, generic concerns centering on the classification system may be raised, while in the individual grading type, considerations re-

lating only to the affected employee are cognizable.

The resolution of the differences between petitioners and the Government in this case turns on the construction of two arguably conflicting statutory provisions added to the civil service laws by the CSRA. The first of these is the section that defines those agency personnel actions that are individually appealable by the affected employees. Section 7512 of title 5, eliminating the potential for ambiguity that existed under the prior law, explicitly provides that reductions in grade are appealable actions.[10] The second relevant section, however, appears to taketh away what the first giveth. Section 5366(b) provides, in pertinent part, that "any action which is the basis of an individual's entitlement [to grade and pay retention benefits] ...." is *not* an appealable action. 5 U.S.C. § 5366(b) (Supp. III 1979). Respondents take the position that this latter section has the effect of precluding MSPB jurisdiction over individual appeals of agency personnel actions.

### III. DISCUSSION

Petitioners present both statutory and constitutional challenges to the MSPB orders. The heart of their statutory argument is the contention that the CSRA does not, either explicitly or by intent, deprive federal employees of the right to challenge individual reassignment decisions. The alternative constitutional arguments, based on the assumption that the CSRA was properly construed by the MSPB, allege deprivations of due process and equal protection.

#### A. *The Statutory Arguments*

##### 1. *The Positions of the Parties*

■ We begin with consideration of the relevant provisions the meanings of which

---

**10.** Under the predecessor of 5 U.S.C. § 7512(3) (Supp. III 1979), "reductions in rank or pay" were deemed adverse actions and were therefore appealable. *See* 5 U.S.C. § 7511 (1976) (repealed); *see* note 6, *supra.* The House Report that accompanied the House version of the CSRA noted that "[a] reduction in rank involves a change in an employee's relative position in his agency which does not involve a reduction in pay or grade." House Report No. 1403 at 22. Yet the Civil Service Commission, in implementing § 7511, construed a reduction in grade pursuant to a reclassification as a covered "reduction in rank or pay," notwithstanding salary retention. 5 C.F.R. § 752.201(b)(4) (1978). The current provision eliminates these ambiguities.

are not in dispute. The MSPB, as an administrative tribunal created by Congress, has only that jurisdiction granted it by the statutes empowering it to act. Section 7513(d) of title 5 provides that a federal employee against whom a covered action [11] is taken has the right to appeal the action to the MSPB. Section 7512(3) of that title provides, as the Government concedes, that a "reduction in grade" gives rise to this right of appeal.[12]

In the subchapter that sets forth the grade and pay retention benefits discussed above, a second provision, 5 U.S.C. § 5366 (Supp. III 1979), further refines the scope of appeal rights of employees who receive those benefits. Subsection (a) of section 5366 [13] confirms the existence of certain appeal rights regardless of the existence of grade or pay retention, and the parties do not dispute its meaning. The divergence of the parties' positions begins, however, when we move to the central provision in the current dispute, section 5366(b). It provides:

> (b) For purposes of any appeal procedures (other than those described in subsection (a) of this section) or any grievance procedure negotiated under the provisions of chapter 71 of this title—
>
> > (1) *any action which is the basis of an individual's entitlement to benefits under this subchapter, and*
> >
> > (2) *any termination of any such benefits under this subchapter,*
>
> *shall not be treated as appealable under such appeals procedures or grievable under such grievance procedure.*

5 U.S.C. § 5366(b) (Supp. III 1979) (emphasis added).

Greatly truncated, petitioners' statutory arguments proceed as follows. Section 7513 confers jurisdiction on the MSPB to hear appeals of the agency actions specified in section 7512, one of which is a reduction in grade. The existence of pay and grade retention benefits does not alter the charac-

---

**11.** Under the pre-CSRA civil service laws, appealable actions were known as "adverse actions," *see* 5 U.S.C. § 7511(2) (1976) (repealed), and that phrase became a term of legal art used both by practitioners in the field and by federal employees. Under the CSRA regimen, however, the phrase "adverse actions" is no longer employed as a definitional term; rather, the corresponding provision, 5 U.S.C. § 7512 (Supp. III 1979), refers in its section heading to "[a]ctions covered," and only in the chapter heading is the phrase "adverse actions" used. *See* Chapter 75, title 5, United States Code (Supp. III 1979).

There is no suggestion in the legislative history that the Congress, in eschewing the use of "adverse actions" as a definitional term, intended substantive change, and we perceive none in the employment of the new language. *See also* note 18, *infra*.

**12.** Section 7512 of title 5 provides, in pertinent part:

This subchapter applies to—
(1) a removal;
(2) a suspension for more than 14 days;
(3) a reduction in grade;
(4) a reduction in pay; and
(5) a furlough of 30 days or less. . . .
5 U.S.C. § 7512 (Supp. III 1979).

**13.** 5 U.S.C. § 5366(a) provides the following:
(a)(1) In the case of the termination of any benefits available to an employee under this subchapter on the grounds such employee

declined a reasonable offer of a position the grade or pay of which was equal to or greater than his retained grade or pay, such termination may be appealed to the Office of Personnel Management under procedures prescribed by the Office.
(2) Nothing in this subchapter shall be construed to affect the right of any employee to appeal—
(A) under section 5112(b) or 5346(c) of this title, or otherwise, any reclassification of a position; or
(B) under procedures prescribed by the Office of Personnel Management, and any reduction-in-force action.
This subsection confirms the existence of certain appellate rights regardless of grade and pay retention. Under it, the concerned employee is permitted to appeal to the Office of Personnel Management (OPM) the termination of pay and grade benefits where the termination is the result of the employee's alleged failure to accept a reasonable offer of alternative federal employment. 5 U.S.C. § 5366(a)(1). Subsection (2)(A) preserves the pre-CSRA rights of employees affected by reclassification decisions to file classification appeals. Finally, subsection (2)(B) mandates the existence of a procedure for the appeal of reduction-in-force decisions, and currently applicable OPM regulations contemplate the pursuit of such appeals before the Merit Systems Protection Board. 5 C.F.R. § 351.901 (1981).

ter of such a reduction; under the earlier scheme, even with salary retention, petitioners argue, a grade reduction was an adverse action, and the new section 7512 only makes that status more explicit.

Turning to section 5366(b), petitioners argue that, when properly construed *in pari materia* with sections 7512–13, that subsection does not preclude an individual appeal of a reassignment to the MSPB. Rather, petitioners suggest that the "action" that is the basis of an employee's pay and grade retention entitlements under section 5366(b)(1) is the *position reclassification decision* as opposed to the decision to *downgrade the individual employee*. Distinguishing "actions against positions" from "actions against employees," petitioners contend that section 5366(b)(1) prohibits the appeal to the MSPB of only the former. *See, e.g.*, Brief for Carter Petitioners at 14. This "plain language" construction of the CSRA reconciles, in petitioners' view, the otherwise conflicting provisions of sections 5366(b) and 7512. *Id.* at 12–15.

Petitioners buttress this "plain" construction of subsection (b) with several complementary arguments. They contend that the legislative history of the CSRA generally, and the sections at issue in the instant litigation particularly, evince a consistent congressional intent to expand the ambit of protections afforded federal employees. Petitioners distinguish portions of the House Report on the bill that would otherwise devastate their central contention by arguing that "radical" changes in the House proposal were made at Conference that, in effect, preserved existing appeal rights for employees. *See* Brief for Atwell Petitioners at 35. Finally, petitioners submit that the canon of statutory construction holding that existing rights or entitlements should not be deemed extinguished in the absence of specific language to that effect militates in favor of their position. *Id.* at 28–29.

The Government's position is more simply stated. Respondents argue initially that, in light of the expanded grade and pay retention provisions provided by the CSRA, a downgrading is no longer an appealable ac-

tion from the standpoint of the affected employee. Rather, as an employee cannot be adversely affected in a pecuniary fashion until the expiration of the two-year transition period, there can be, respondents submit, no right of appeal under sections 7512–13 until that period elapses. *See, e.g.*, Brief for Atwell Respondents at 13. The conclusion drawn from this analysis is that there is, in fact, no conflict between sections 7512 and 5366(b); no right of appeal arises under the former until the termination of the grade retention benefits. *Id.*

Second, respondents contend that section 5366(b) was properly construed by the MSPB as precluding individual reassignment appeals of the type brought by petitioners. In respondents' view, section 5366(b) was the product of a desire on the part of Congress to afford greater flexibility in personnel decisionmaking to federal administrators. On this view, Congress, in the hope of creating a more efficient personnel structure, "exchanged" individual appeal rights for the enhanced pay and grade retention benefits found in the CSRA. The existence of this *quid pro quo* arrangement is, in respondents' view, amply supported by the legislative history accompanying the 1978 Act. *See generally* Brief for Atwell Respondents at 16–22.

### 2. *Analysis*

■ In reviewing orders of the MSPB, we are admonished by the judicial review provision of the CSRA to set aside only those decisions that are arbitrary, capricious, procedurally incorrect, or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (Supp. III 1979). The Government urges that this standard of review requires us to show "considerable deference" to the decisions challenged in the current litigation. *See* Brief for Atwell Respondents at 13, *quoting Rotolo v. Merit Systems Protection Board*, 636 F.2d 6, 8 (1st Cir. 1980). We prefer, however, petitioners' characterization of our reviewing function in a case such as this. *See* Brief for Atwell Petitioners at 12–14. Decisions of this court and of others have consistently taken

the position that more strenuous review is appropriate where the disputed order or decision directly involves the construction of the organic statute under which the agency operates. *See, e.g., National Distributing Co. v. United States Treasury Department*, 626 F.2d 997, 1019 (D.C.Cir.1980); *H. W. Wilson Co. v. United States Postal Service*, 580 F.2d 33, 37 (2d Cir. 1978). Although we recognize that there are circumstances under which "courts should defer to the agency's understanding of the statute which it administers," *see NLRB v. Pipefitters*, 429 U.S. 507, 528, 97 S.Ct. 891, 902, 51 L.Ed.2d 1 (1977), we view the instant case as analagous to the situation faced by this court in *Citizens to Save Spencer County v. EPA*, 600 F.2d 844 (D.C.Cir.1979). In that case, the court concluded that, on review of an agency's attempt to reconcile arguably conflicting statutory provisions, the proper judicial role was "to ensure that the agency has effected an appropriate harmonization of the conflicting provisions while remaining within the bounds of [its] statutory authority." 600 F.2d at 871. Our review, accordingly, will be sufficiently strict to ensure that the MSPB is assuming the appellate role Congress intended it to have under the CSRA.

■ Applying this standard, the threshold question we must resolve is whether a downgrade is an appealable action under section 7512 where the affected employee receives the benefit of grade retention. At first blush, the answer seems apparent: as section 7512 permits appeals of reductions in grade, a downward reclassification leading to a downgrade would perforce be appealable.

The Government's response—that the existence of grade retention means that no appealable reduction in grade occurs—is beguiling in its simplicity. It centers, however, on the tautological assertion that because there is no immediate reduction in grade when a position is reclassified, there is no such reduction within the meaning of section 7512. This construction would, however, suggest that the reduction in grade that occurs at the end of the grade reten-

tion period *is* an appealable action under section 7512. Yet, if this construction were correct, we might be faced with precisely the same legal issues that petitioners raise in these actions two years hence. The Government suggests in response that section 5366(b) explicitly bars appeals of the termination of interim grade and pay retention benefits and that our hypothetical lawsuit down the road will accordingly not arise. The Government's argument here, however, assumes the answer to the very legal question that the current litigation poses: if section 5366(b)(2) bars appeals of the termination of grade and pay benefits, then section 5366(b)(1) must bar appeals of actions that lead to their original receipt.

We are thus left with a clean slate in determining whether petitioners were reduced in grade within the meaning of section 7512. Although the question might well be a close one were we scrutinizing section 7512 in a vacuum, when we examine that section in the overall context of the CSRA, we are led to the conclusion that it was the intent of Congress to preclude appeals to the MSPB of individual downgradings where pay and grade retention are available. Thus, as a strict matter of logic, we conclude that a reclassification decision that leads, at the end of pay and grade retention, to a reduction in grade is not an appealable action under the terms of section 7512. We readily acknowledge that an individual employee whose position is downgraded is negatively affected by the agency decision; at minimum, there is the present value loss of future earnings, and a variety of other consequential injuries. We believe, however, that it was the intent of Congress to eliminate individual appeals of the type brought by petitioners. To explain our holding more fully, it is necessary to move to a consideration of the impact of section 5366(b).

Section 5366(b)(1) provides, in pertinent part, that "any action which is the basis of an individual's entitlement to [grade and pay retention] benefits" is not appealable. The plain language of this subsection suggests that individual reassignment decisions

pursuant to a reclassification are not appealable. Petitioners, however, argue that the relevant "action" that they seek to challenge is the individual reassignment decision and that the effect of (b)(1) is only to preclude appeals of position reclassifications to the MSPB. *See, e.g.,* Brief for Carter Petitioners at 14.

■ Although this argument is ingenious, we find the position/person distinction unpersuasive. In the first place, as respondents note, interpreting subsection (b)(1) as precluding classification appeals to the MSPB renders that subsection redundant. Under the CSRA, classification matters are within the province of the OPM, and by logical implication, reclassification decisions, absent special circumstances, are appealable only to that body. *See* 5 U.S.C. § 5112(b); 5 U.S.C. § 5346(c). Second, and more significantly, it is apparent that it is indeed the reassignment of the person, and not the reclassification of the position, that gives rise to grade and pay retention benefits. Respondents cite the example of a position reclassification in which the affected employee is not downgraded, but rather is reassigned to a new position at the same grade as the former one. In such a case, it is clear that no right to appeal exists under the CSRA, as there has been no grade reduction. The only distinction between that case and those at the bar, however, is that in the latter the individual employees *were* reassigned to the lower-graded positions; in both types of cases a position was downgraded, but in the latter type individual grades were lowered as well. We are compelled to conclude, therefore, that it is the individual reassignment that gives rise to grade and pay retention benefits for the purposes of subsection (b)(1) and that such a reassignment is not appealable.

This conclusion is, we believe, amply sustained through scrutiny of the legislative history of the CSRA. The CSRA was, in fact, an amalgam of separate bills. One of these, H.R. 9279,[14] dealt exclusively with pay and grade retention benefits and was not originally introduced as part of comprehensive civil service reform. As petitioners correctly note, one clear aim of the proponents of H.R. 9279 was to enhance the protections afforded employees whose positions were downgraded "because of circumstances over which [they] have no control." House Report on Grade and Pay Retention for Certain Employees, H.R.Rep.No. 944 (Part I), 95th Cong., 2d Sess. 2 (1978) [*hereinafter* House Report No. 994]. To this end, the bill included provisions guaranteeing *indefinite* grade retention to those employees whose positions were downgraded. The Report accompanying H.R. 9279 noted that this protection, when coupled with pay retention, would ensure that federal employees would "not be substantially harmed by the effects of necessary downgrading actions." House Report No. 994 at 3.

As both petitioners and respondents note, the draftsmen of H.R. 9279 also intended to eliminate the right to appeal individual reassignment decisions made pursuant to a position reclassification. H.R. 9279 was perceived as a clear *quid pro quo* arrangement; in return for surrendering the right to appeal individual reassignment decisions, federal employees were accorded significantly greater financial and grading protections in cases of downgrades. The Report accompanying H.R. 9279 noted that by eliminating individual reassignment appeals, considerable cost savings would accrue to the government, and the efficiency of the federal personnel system would be enhanced. House Report No. 994 at 7.

14. H.R. 9279, 95th Cong., 1st Sess. (1977), *reprinted in* House Report on Grade and Pay Retention for Certain Employees, H.R.Rep.No. 994 (Part I), 95th Cong., 2d Sess. 31–34 (1978) [*hereinafter* House Report No. 994]. H.R. 9279 was introduced jointly by Representatives Nix and Spellman, and was itself a combination of two separate bills. The Civil Service Commission had offered its own proposal for pay and grade retention, which Representative Nix had introduced as H.R. 9277, 95th Cong., 1st Sess. (1977). The Commission's proposal called for indefinite pay retention, with grade retention provided for a two-year period. An earlier proposal of Representatives Nix and Spellman, H.R. 6953, 95th Cong., 1st Sess. (1977), had authorized indefinite grade retention in reclassification cases. H.R. 9279 combined features of both H.R. 9277 and H.R. 6953. *See generally* House Report No. 994 at 1–2.

H.R. 9279 was subsequently incorporated into the bill that was to become the House version of the Civil Service Reform Act. *See* House Report No. 1403 at 13. The House version carried over the provisions for indefinite grade retention and enhanced pay retention that were contained in H.R. 9279. *Id.* at 65–67. This version also contained the proposal to preclude appeals of individual reassignment decisions where grade and pay retention benefits were provided. *Id.* at 69–70.

The House version of the Civil Service Reform Act was sent to the Conference Committee for reconciliation with the corresponding Senate bill, and it was at the Conference stage that the alterations that prompted the current litigation were made. At Conference, the House provisions regarding pay and grade retention were adopted virtually *in toto*. *See* Conference Report on the Civil Service Reform Act of 1978, S.Rep.No. 1272, 95th Cong., 2d Sess. 160 (1978). Without explanation, however, the Conference Committee amended the House grade retention proposal to limit the period of grade retention in reclassification cases to two years. *Id.* There is no suggestion that the members of the Conference

limited grade benefits in some type of exchange for the restoration of the right of individual reassignment appeals; the Conference Report, however, contains no explicit indication that such appeals were precluded.[15]

Petitioners would have us disregard the prior legislative history surrounding the grade and pay retention provisions in light of the Conference Committee's amendments. This, with respect, we decline to do. Although this case would have been a far easier one had there been some indication of what the Conference Committee intended in reducing the extent of grade protection, we find no support in the legislative history for the proposition that the members of the Conference intended, against the unequivocal will of the House draftsmen, to authorize appeals of the type brought by petitioners. The legislative history surrounding the grade and pay provisions prior to the Conference indicated the desire on the part of the House to (1) increase the financial and grade protections afforded downgraded employees,[16] and (2) eliminate the right to appeal downward reassignments.[17] Although the Conference

**15.** *See* note 18, *infra.*

**16.** *See, e.g.,* House Report No. 1403 at 13.
The current pay retention law does not afford sufficient protection for an employee who has accepted a particular grade level in good faith and subsequently is reduced to a lower grade level because of circumstances over which he has no control. . . . Title VIII [of the House version of the CSRA] will substantially improve the protections afforded employees by authorizing indefinite grade retention for employees who are reduced in grade as a result of reclassification actions. . . .

**17.** The Report accompanying H.R. 9279 stated:
Subsection (b) of section 5367 provides that any action which is the basis of an individual's entitlement to benefits under subchapter VI or any termination of such benefits shall not be treated as an adverse action for purposes of any appeal procedures. This subsection is not intended to prohibit the filing of classification appeals (such as under part 511 of the Commission's regulations) or reduction-in-force appeals (part 351 of the Commission's regulations). Rather, subsection (b) is intended to prohibit

the filing of adverse action appeals based on downgrading actions or termination of retained grade or pay benefits. Under subsection (b) the following actions would not constitute adverse actions for purposes of appeals procedures:
1. Reduction of employee to lower grade as a result of reclassification of position . . . .
House Report No. 994 at 15. Section 5367 of H.R. 9279 was, it should be noted, the precursor of current 5 U.S.C. § 5366.
Similarly, the Report accompanying the House version of the CSRA stated:
Subsection (b) of section 5367 provides that any action which is the basis of an individual's entitlement to benefits under subchapter VI or any termination of such benefits shall not be treated as an appealable action for purposes of any appeal procedures described in paragraph (2) of subsection (a). Under subsection (b), the following actions would not be appealable (except as provided in paragraph (2) of subsection (a)):
1. Reduction of employee to lower grade as a result of reclassification of position . . . .
House Report No. 1403 at 69. Again, section 5367 of this House bill was the precursor of current 5 U.S.C. § 5366.

Committee did reduce the grade protection component of this package, the overall protections were undoubtedly increased over those available before the CSRA. Moreover, petitioners cannot point to a whit of evidence that suggests that the Conference thought it was proposing a "radically different" or "dramatically altered" grade and pay retention package for reconsideration by the respective houses of Congress.[18]

We conclude, therefore, that it was the intent of Congress to eliminate appeals of reassignments made under a position reclassification. Although we can offer no definitive reason why the Conference members reduced the grade retention protections contained in the House bill, one plausible suggestion is that they wished to equalize

the grade retention benefits offered reclassified employees with those offered employees subjected to a reduction-in-force.[19] Whatever the explanation, we believe that the draftsmen of what is now section 5366(b) intended to eliminate individual appeals of downward reassignments and that they succeeded in their aim with the language they adopted.

On this view, we believe that it is possible to reconcile sections 5366(b) and 7512, though we achieve this reconciliation in a manner suggested by neither petitioners nor respondents. As we have stated above, the effect of section 5366 is to preclude individual appeals of downgradings made pursuant to position reclassifications. We conclude that, where pay and grade reten-

---

18. The main argument to this effect made by petitioners is that there was an inextricable link in the eyes of the congressional draftsmen between indefinite grade retention and the elimination of individual appeals. *See* Brief for Atwell Petitioners at 34–37; Brief for Carter Petitioners at 15–19. Petitioners accordingly contend that, by limiting grade retention to the two-year term, the Conference Committee members *sub silentio* reinstituted the appellate scheme that had prevailed before the CSRA. There is, however, not a single indication of this intent in the Conference Committee's Report on the CSRA, nor, for that matter, in any other part of the legislative history. Moreover, it would indeed be a peculiar manner of draftsmanship technique to attempt to achieve a desired result by the use of certain language, and then to attempt achievement of precisely the *opposite* result through the use of the *same* language; yet in effect, that is what petitioners argue here. They contend that, by altering the extent of grade retention at Conference, the Congress by implication retained the pre-CSRA appellate scheme. Surely, however, if the Conference members or the Congress as a whole had intended such a result, either the language of the statute itself, or the accompanying legislative history, would have reflected that desire.

The Carter petitioners suggest that such an alteration in language did occur, though not at the Conference stage. They contend that the elimination of the phrase "adverse actions," *see* note 11, *supra,* from § 5366 in the House version of the CSRA evinces a congressional intent to continue individual reassignment appeals. *See* Brief for Carter Petitioners at 17–18. This argument also fails. In pressing this contention petitioners seek, in effect, to have their cake and to eat it, too. The House version of the CSRA contained, as noted in the text, provisions granting indefinite grade reten-

tion to employees. Thus, petitioners argue that the House draftsmen intended both to grant such grade retention and to continue the existing appellate scheme. To put the matter mildly, this seems to us far-fetched in light of the many references in the legislative history to the desirability of eliminating individual appeals. Moreover, the phrase "adverse actions" was not, it seems clear, deleted from the House version of the CSRA in an attempt to retain the appellate status quo; rather, the draftsmen apparently believed that the phrase had outlived its utility as a definition. *See* note 11, *supra.*

19. The Conference Committee version of the CSRA provided that employees who were downgraded pursuant to a reduction in force were entitled to only two years of grade retention, and the final CSRA contained the same language. *See* 5 U.S.C. § 5362(a) (Supp. III 1979). The Conference Committee Report does not definitively state that the rationale underlying the elimination of indefinite grade retention for reclassified employees was this equalization of benefits. It does, however, contain language that might suggest this intent:

> The conference substitute contains the provisions of title VIII of the House amendment except that the authorized period of grade retention in reclassification cases is limited to 2 years as in the case of reduction-in-force actions. Under the conference substitute, employees who are reduced in grade either as a result of reclassification actions or reductions in force will be entitled to retain their previous higher grades for a period of 2 years . . . .

Conference Report on the Civil Service Reform Act of 1978, S.Rep.No. 1272, 95th Cong., 2d Sess. 160 (1978), U.S.Code Cong. & Admin. News, p. 2723.

tion are provided, the downgrades suffered by petitioners are not the sort of "reductions in grade" contemplated under section 7512(3). Although we cannot agree with respondents that an employee whose position is reclassified downward does not, at the end of the two-year period of grade retention, suffer a reduction in grade as that phrase would be used in common parlance, we believe that the Congress intended that only those reductions that do not give rise to retention benefits should be appealable.

■ Accordingly, a more accurate phrasing of section 7512(3) to achieve this end would have been "reduction in grade without grade and pay retention." In so stating, we readily recognize that it is not for the members of this or any other court to redraft statutes to render them more grammatically correct or more to our personal predilection; it is, however, unequivocally our mission to take arguably contradictory statutory passages and to reconcile them where the intent of Congress is clear but the implementation somewhat faulty. In reaching this result, we are guided as well by the cardinal canon of statutory construction that dictates that provisions should, whenever possible, be construed to achieve consistency. *See, e.g., Citizens to Save Spencer County*, 600 F.2d at 870.

We wish to stress that, in construing as we do the phrase "reduction in grade," we do not mean to suggest that it is a phrase of legal art or one subject to the nuances of neat parsing. Rather, we simply seek to reconcile facially contradictory statutory provisions to effectuate the will of Congress. We are in this effort guided by the words of Justice Frankfurter in *Carpenters' Union v. NLRB:*

Because of the infirmities of language and the limited scope of science in legislative drafting, inevitably there enters into the construction of statutes the play of judicial judgment within the limits of the relevant legislative materials.

357 U.S. 93, 100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958). Our decision today is merely an example of this "judicial judgment."

B. *The Constitutional Arguments*

■ We may dispose of petitioners' constitutional challenges more briefly. Petitioners offer two separate constitutional arguments, both based on the due process clause contained in the fifth amendment. They first contend that, as the lowering of federal grade pursuant to a position reclassification constitutes the deprivation of a property interest, a trial-type hearing must be afforded them to contest that loss. *See* Brief for Carter Petitioners at 19–21; Brief for Atwell Petitioners at 19–21; Brief for Atwell Petitioners at 45–46. Second, they argue that the CSRA appellate scheme violates the equal protection component of the due process clause [20] by creating an irrational classification in that certain federal employees are accorded appeal rights while others are not. *See* Brief for Atwell Petitioners at 39–44.

■ With regard to the property deprivation contention, we may assume that a reduction in grade constitutes the loss of a valuable property interest and that this loss occurs at the time of the position reclassification regardless of pay and grade retention.[21] Even with these assumptions, how-

**20.** The fifth amendment's due process clause does, of course, contain an equal protection component that "prohibit[s] the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

**21.** We would note that it is not altogether clear that a federal employee has a property interest in continued employment at the same grade. The several cases cited by petitioners in support of the claimed existence of such an interest all concerned, we note, the *termination* of

employment, and one might surmise that a federal employee's expectations are likely to be more concrete when what is at issue is the very continuation of employment. On the other hand, property interests may arise out of employment relationships in a variety of ways, *see Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and our disposition of the current litigation does not turn on the resolution of whether the expectation of continued employment at the

ever, we must reject petitioners' claims on the ground that the procedures provided by the Government for the challenge of downgradings are constitutionally adequate. There is no doubt that employees who are reclassified may file classification appeals with OPM. *See* 5 U.S.C. § 5112(b); 5 U.S.C. § 5346(c); 5 C.F.R. Part 511, Subpart F (1981). As we discuss more fully below,[22] if allegations of impermissible discrimination are made in connection with a downgrading, an appeal to the Equal Employment Opportunity Commission (EEOC) will lie. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16; Regulations of the Equal Employment Opportunity Commission, 29 C.F.R. §§ 1613 *et seq.* (1981). In sum, applying the balancing approach suggested by the Supreme Court's decision in *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), we find that the appellate procedures provided by Congress to challenge a downgrade are not constitutionally infirm. Congress has a strong interest in promoting the efficient operation of its federal personnel system, and petitioners' interests, though undoubtedly important to them, are not nearly of the same magnitude as those they would have, for example, were their employment terminated.

 Turning to the equal protection argument, we harbor absolutely no doubt that the classification scheme contained in the CSRA appellate provisions is rational.[23] One can summarize briefly the challenged classification. As the MSPB held and as we have ruled today, the interplay of sections 7512(c) and 5366(b) precludes covered employees from appealing individually downgrades made pursuant to reclassifications where grade and pay retention are provided. The section providing for grade retention, however, authorizes it only if the affected *position* had been classified at the

*higher* grade for a continuous period of at least one year prior to the reclassification. 5 U.S.C. § 5362(b)(2) (Supp. III 1979). In other words, if the position that was subsequently downgraded had been rated at the higher grade for less than one year, the employees occupying that position do not receive the benefit of grade retention upon the downgrading. Those employees do, however, have the right, under section 7512(c), to appeal their individual reassignments to the MSPB.

Petitioners challenge this distinction as irrational, arguing that it provides a small group of employees—those occupying positions that had been classified at a higher grade for a shorter period than a year—greater appellate rights than those whose positions had been classified for the longer period. The response to this contention is simple: there is a sound grounding for this classification. As the MSPB noted in its *Atwell* order, the "grade and pay retention provisions of the law clearly provide a substantial benefit to those employees to whom they are applied which does not inure to employees who are not eligible" for those benefits. *Atwell v. Department of the Army,* MSPB Order No. PH075299098 (July 25, 1980) at 8; A.J.A. at 50. In its wisdom, Congress gave those employees not entitled to grade and pay retention benefits individual appeal rights. This disparate treatment of federal employees strikes us as precisely the sort of legislative balancing that Congress exists to do. As the Supreme Court noted in *Personal Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2291–2292, 60 L.Ed.2d 870 (1979), "[m]ost laws classify, and many affect certain groups unevenly. . . . When the basic classification is rationally based, uneven effects upon particular groups within a class are of no constitutional concern." The "basic validity" of this classification is beyond assail.

same grade constitutes such an interest. We will therefore assume, *arguendo*, the existence of a property interest in the continuation of federal employment at a particular grade.

22. *See* Part IV, *infra.*

23. As petitioners allege that the challenged classification neither impinges upon a fundamental right nor affects adversely any "suspect class," we apply the rationality standard to the CSRA's appellate scheme. *See generally* L. Tribe, American Constitutional Law §§ 16–2 to 16–5 (1978).

## IV. THE CSRA AND CLAIMS OF BIAS OR IMPERMISSIBLE DISCRIMINATION

■ A strong and disturbing undercurrent flows beneath the challenge brought by petitioners in this litigation, and we wish to devote ourselves briefly to it. In their briefs and at oral argument, petitioners suggested that, unless the MSPB construction of the CSRA was reversed, affected employees would have no opportunity to challenge the "bona fides" of a reclassification decision. See Brief for Atwell Petitioners at 45. For example, petitioner Carter contends that, if the MSPB's construction of sections 5366(b) and 7512(c) is upheld, no employee could appeal a downgrading on the ground that it was the result of racial or sexual bias. See Brief for Carter Petitioners at 23.

We disagree. Ms. Carter's fear that her discrimination complaint would no longer be cognizable by the EEOC, for example, is premised on the mistaken assumption that EEOC appeals are encompassed within the meaning of "appeal procedures" as used in section 5366(b).[24] This is not the case. As respondents concede, Title VII of the Civil Rights Act of 1964, as currently in force, and applicable regulations issued by the EEOC,[25] provide for full administrative and judicial review of discrimination claims. Brief for Carter Respondents at 16. Although this issue was not, strictly speaking, presented in this petition for review, in light of its obvious importance we stress that section 5366(b) was not intended to and

does not deprive federal employees of the right to challenge the administrative personnel actions before the EEOC or other comparable bodies.[26] The use of the phrase "any appeal procedures" in section 5366(b) refers, we have no doubt whatsoever, only to procedures offered by the OPM or the MSPB.

Thus, although we agree with respondents that the MSPB is not authorized, absent an independent jurisdictional basis, to hear claims of discriminatory personnel actions in cases like those of petitioners, we emphasize that the EEOC remains ready and, we hope, able to respond to allegations of discrimination.

## V. CONCLUSION

In administering the federal civil service system, the Congress faces a Herculean task in attempting to reconcile conflicting objectives. On one hand, the federal government is an employer, and it must be accorded the administrative prerogative and flexibility necessary to act efficiently in monitoring a vast personnel system. On the other hand, the same Congress that needs these employer prerogatives is also the body that, through its legislation, demands that employers in the private sector act fairly in dealings with employees. Thus, the Congress faces a special burden in acting as employer; it is, to paraphrase John Winthrop, the "employer on the hill."

■ We believe that the CSRA was a product of these cross-currents and that the

---

**24.** Section 5366(b) begins with the language, "For purposes of any appeal procedures . . . ." Ms. Carter argues that this language could be construed to deprive federal employees of any forum to hear allegations of prohibited discrimination. She contends, for example, that complaints now cognizable by the Equal Employment Opportunity Commission could be deemed an "appeal procedure." See Brief for Carter Petitioners at 23. Although we sympathize with the fears expressed by Ms. Carter, we feel they are unfounded for the reasons noted in the text.

**25.** See 29 C.F.R. §§ 1613.201–.806 (1981) (Equal Employment Opportunity in the Federal Government).

**26.** Without intending to be all-inclusive, we would note that a variety of courses remain available to federal employees who allege agency "mala fides" in personnel or employment practices. Federal employees may, for example, seek review by the Federal Labor Relations Authority of claims of unfair labor practices. 5 U.S.C. §§ 7116, 7118 (Supp. III 1979). In addition, the Special Counsel of the MSPB has specific statutory authority under the CSRA to investigate allegations of the "prohibited personnel practices" set forth in 5 U.S.C. § 2302(b) (Supp. III 1979). 5 U.S.C. § 1206(a)(1) (Supp. III 1979). The Special Counsel is also empowered to pursue further these allegations on behalf of the concerned employee if the facts gleaned through investigation provide a reasonable foundation for the charges. 5 U.S.C. § 1206 (Supp. III 1979).

provisions at issue in this litigation attest to that fact. We hold that section 5366(b) bars the appeal of individual downgrades pursuant to reclassifications where grade and pay retention are provided the affected employee; we hold as well that section 7512(3) does not accord a right of appeal where these retention benefits are available. We stress, however, that federal employees will not, by virtue of our decision today, be deprived of a forum for the consideration of claims of prohibited discrimination. If some regular agency procedure exists to consider discrimination claims, the right of access to it will not be affected by section 5366(b); more important, the EEOC remains available to respond to these claims regardless of subsection (b).

With these caveats, we affirm the MSPB orders challenged in this litigation.

*It is so ordered.*